Carl McINTIRE, Plaintiff,

v.

WESTINGHOUSE BROADCASTING COMPANY, INC., Defendant.

Civ. A. No. CA 72–3669–MA.

United States District Court,
D. Massachusetts.

Nov. 9, 1979.

Donald A. Macksey, Quincy, Mass., for plaintiff.

Charles R. Parrott, Nutter, McClennen & Fish, Boston, Mass., for defendant.

MEMORANDUM AND ORDER

MAZZONE, District Judge.

The plaintiff brought this defamation action claiming that an editorial broadcast by the defendant contained false and defama-

tory statements which resulted in injury to the plaintiff's reputation. Both sides have moved for summary judgment on the issue of actual malice. The following undisputed facts are set out by the record.

The plaintiff, Carl McIntire (McIntire), has been the pastor of the Bible Presbyterian Church of Collingswood, New Jersey, for more than 43 years. He is the author of several publications and the director of a religious radio program called the 20th Century Reformation Hour. That program is broadcast throughout the United States as well as in other countries.

The defendant, Westinghouse Broadcasting Company (Westinghouse), was the owner and operator of television station WJZ—Channel 13, Baltimore, Maryland on September 6, 1972 and prior thereto. As part of its daily programming, Channel 13 made editorial announcements.

During the relevant period, Westinghouse maintained an editorial board. Its members were the station general manager, the editorial director, the area vice president and, at times, other members of the WJZ staff. The editorial board had the responsibility of carrying out the editorial policy of WJZ and all editorials were based on the collective judgment of the board members. Gwinn Owens, the editorial director, was responsible for researching and drafting all editorials. Members of the board would, from time to time, make contributions to the editorial content. Frequently, Owens would revise or re-draft editorials after the board reviewed a draft editorial. Owens was responsible for verifying the facts contained in an editorial. Once in final form, an editorial would be presented by the general manager or the area vice president.

Just prior to September 6, 1972, a Soviet vessel, the TOVARISHCH, arrived and docked in Baltimore harbor. This event drew a great deal of attention in the Baltimore area. When the ship arrived in the harbor, thousands of people, with members of the media, including Gwinn Owens, the editorial director of the defendant, gathered at the harbor. During this time, the plaintiff and his followers were protesting the arrival of the ship at the harbor. They marched and carried placards denouncing its arrival. At the same time and in the same general area, a group of neo-Nazis protested against the arrival of the vessel. The arrival of the ship and the activities of the protesters were reported as news events by the Baltimore Sun, the Baltimore Evening News and the Baltimore News American newspapers.

About the time of the demonstrations at the Baltimore harbor, two other events had recently taken place. The National Socialist White Peoples Party (also called the neo-Nazis) opened their new headquarters in southeast Baltimore, a predominantly Polish community. In Munich, Germany, the Olympic games had been disrupted by a group of Arab terrorists.

As a result of these events, the defendant decided to make an editorial comment. Owens researched and wrote the preliminary and final drafts of the editorial. Other members of the editorial board may have contributed. No minutes were kept of the meetings of the editorial board. The board viewed this editorial as an "opportunity to point out our distress at what had happened alongside the Russian ship" and that they chose to "lace" this event together with news in recent history "for a variety of reasons." There was "considerable" discussion of plaintiff's purposes in picketing the ship.

On September 6, 1972, the defendant broadcast a two minute, ten second editorial entitled, "A WORLD OF TRIBES—OR PEOPLE?", the substance of which is the basis of plaintiff's claim. The September 6, 1972 editorial was videotaped and broadcast twice, at 1:25 P.M. and 6:55 P.M., and was received and viewed by television viewers in the metropolitan Baltimore area. Alan J. Bell, general manager of WJZ, read the editorial. After its delivery over the airwaves, copies of the editorial were mailed to about 250 persons. The editorial stated the following:

"Hate, like poison ivy, seems to flourish in all climates, including Munich and Baltimore. Until yesterday the Olympic

games were a joyful display of athletic achievement. The occasional minor outcroppings of international jealousy were secondary to the obvious respect and friendship between the individual athletes.

Suddenly, the joy was snuffed out by Arab terrorists. Their hatred of Israel is so intense that innocent lives are of no consequence to them. Whatever shred of justice might belong to the Arab cause is overshadowed by their own international barbarity.

But we don't have to look as far away as Munich to find hatred, fear and distrust. In Baltimore, the tranquility of a predominantly Polish section of the city has been shattered by the opening of a neo-Nazi headquarters on Eastern Avenue. Anyone who has seen the official Nazi films of Adolph Hitler simpering with joy over the burning of Warsaw, can appreciate the neighborhood resentment.

Last Saturday a Russian merchant marine training bark, the Tovarishch—which means "friend"—docked in Baltimore at the invitation of the city. Its arrival brought warm and sincere applause from thousands of Baltimoreans. Within a short time, however, the Reverend Carl McIntire and his supporters were picketing the ship, methodically sewing new seeds of distrust.

This is a free country, and the neo-Nazis and the McIntire followers have a right to flaunt their opinions so long as they don't menace anyone's personal safety. But from little seeds of distrust, great tragedies grow. The Munich murders struck most Americans as a personal loss. Perhaps we can learn from Munich that this sense of personal concern as opposed to tribal rivalry is the only hope for the world. But we have to apply it in Baltimore, too."

As a result of the September 6, 1972 editorial, Owens received a few letters and several telephone calls denouncing the publication. Among these callers was Reverend Decker, an associate of the plaintiff. On September 10, 1972, Reverend Decker

was permitted to give an opposing viewpoint on WJZ to the September 6, 1972 editorial in two segments called "Another Point of View."

None of the members of the editorial board were personally acquainted with the plaintiff. Two of the members, Owens and Bell, were, however, familiar with the plaintiff's background and his work as a religious leader and broadcaster during the time the draft editorial was discussed. Both described the plaintiff as a "fundamentalist" religious leader. Owens had no opinion about plaintiff's religious or political philosophy but believed that the plaintiff was a "sower" of distrust with regard to the Soviets. Bell had a "private" opinion of the plaintiff based on things he has read and heard and believed that McIntire had "broken a number of laws." Both sides admit that McIntire was a public figure.

Our analysis must start with *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In that case, the Supreme Court held that the First and Fourteenth Amendments limit a state's power to award damages in a libel action brought by a public official against critics of his conduct in that capacity. That case precluded recovery absent proof that damaging falsehoods had been published with "actual malice"—that is, with actual knowledge of a statement's falsity or with reckless disregard of whether it was false or not. *New York Times v. Sullivan, supra* at 279–80, 285–86, 84 S.Ct. 710. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the court extended the *New York Times* privilege to public figures. "Reckless disregard" is defined as a "high degree of awareness of their probable falsity," *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), and "serious doubts as to the truth." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Further, where there is sufficient evidence to conclude that the defendant in fact entertained "serious doubts as to the truth of his publication" and nevertheless published, actual malice has been dem-

onstrated. *Garrison v. Louisiana, supra* at 730–31, 88 S.Ct. at 1325.

■ It is conceded here that the plaintiff is a public figure (and may have been involved in a public activity). Therefore, his recovery for injury to his reputation is limited, under the *New York Times* standard, to a showing, upon clear and convincing proof, that the defendant published defamatory falsehoods with actual malice. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Moreover, the defamed public figure must prove that the publication was false. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 490, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

The record in this case does not establish the requisite malice needed to overcome the immunity conferred by *New York Times v. Sullivan* and its progeny. It is admitted that the plaintiff demonstrated against the arrival of the Soviet ship and that, at that time and place, a group of neo-Nazis was also expressing their opposition to the Soviet vessel. There are no "serious doubts" that the plaintiff was there and was engaged in this public activity and was observed by Gwinn Owens. This is not consistent with a finding that the editorial conveyed false information.

■ Furthermore, as to the impression conveyed by the editorial, it does not link the plaintiff, organizationally, with the neo-Nazis or the Arab terrorists. It merely suggests that McIntire and his followers were "sewing *[sic]* new seeds of distrust" towards the Soviets. It recognizes that the neo-Nazis and the McIntire followers "have a right to flaunt their opinions so long as they don't menace anyone's personal safety." That recognition is inconsistent with a malicious state of mind. Rather, the record establishes that McIntire and his followers were not acting in concert with the neo-Nazis or the Arab terrorists. Giving the words of the editorial their plain and ordinary meaning, the editorial does not state or suggest that any such alliance existed. Instead, the editorial noted three events: the protest at the harbor by McIntire and his followers, the Munich tragedy, and the

opening of the neo-Nazi headquarters. And then it comments that the conduct of the neo-Nazis in opening their headquarters and McIntire in picketing the ship could create distrust. The fact that the editorial board decided to present multiple, and in some ways, unrelated events in a single editorial does not affect the *New York Times* malice standard. The defendant was not constitutionally required to arrange its editorial comments in such a way as to present the plaintiff in the best possible light and to treat comment-worthy matters under separate headings. *Columbia Broadcasting Systems, Inc. v. Democratic National Comm.,* 412 U.S. 94, 155–56, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Douglas, J. concurring); *see, Pittsburgh Press Co. v. Pittsburgh Commission on Human Rights,* 413 U.S. 376, 400, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (Stewart, J., dissenting).

■ In summary, to the extent that the editorial reported facts, those facts were not false. To the extent that we view the editorial as the means of conveying ideas and opinion, these events were of public concern and deserving of comment. In the opinion of the board, activities such as these could create distrust and hate in our society. This is fair comment and does not support a finding of actual malice. *Gertz v. Robert Welch, Inc., supra.*

■ In light of the above, this case is appropriate for disposition by summary judgment. The well recognized policy that cases should be decided at a trial on the merits is not so strictly applied to defamation cases. The general rule in defamation cases brought by public figures against media defendants is that unless the trial judge, based on the record, including pretrial affidavits, depositions or other documentary evidence, is able to conclude that the plaintiff can prove actual malice as defined above, he should grant summary judgment for the defendant. *Wasserman v. Time, Inc.,* 138 U.S.App.D.C. 7, 9, 424 F.2d 920, 922 (D.C. Cir.1970) *cert. denied* 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970) (Wright, J. concurring); *Time, Inc. v. Johnston,* 448 F.2d

378, 383–84 (4th Cir. 1971); *Bon Air Hotel, Inc. v. Time, Inc.,* 426 F.2d 858, 864–65 (5th Cir. 1970); *The Washington Post Co. v. Keough,* 125 U.S.App.D.C. 32, 35–36, 365 F.2d 965, 967–68 (D.C.Cir.1966), *cert. denied* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *Ando v. Great Western Sugar Co.,* 475 F.2d 531, 534 (10th Cir. 1973); *compare, Goldwater v. Ginsburg,* 414 F.2d 324, 337 n. 21 (2d Cir. 1969) (denying defendant's motion for summary judgment). Likewise, where a publication is protected by the *New York Times* immunity rule, summary judgment, rather than a full trial on the merits, is a proper vehicle for affording constitutional protections. *Bon Air Hotel, Inc. v. Time, Inc., supra* at 864–65.

The record is complete. Liability ultimately depends on the state of knowledge of the falsity of what was said or broadcast. That proof can come directly from the defendant or in the form of objective circumstances from which the ultimate fact could be inferred. The plaintiff has not been precluded from discovery focused at the necessary state of mind of the defendants. See *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). The plaintiff knows now as much as he will ever know about what was said and why it was said. Any objective circumstances, such as absence of verification, inherent implausibility, obvious reasons to doubt the accuracy of the information, or any inconsistent statements by the defendant, have been explored and disclosed in the record.

Viewing the record and the inferences which might reasonably be drawn therefrom in the light most favorable to the plaintiff, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), the plaintiff has failed to show, with "convincing clarity," that the editorial was prepared and published with actual malice. *Medina v. Time, Inc.,* 319 F.Supp. 398, 400 (D.Mass.1970). No purpose is to be served by prolonging this litigation and submitting it to a trier of fact.

Accordingly, the defendant's motion for summary judgment should be allowed.

SO ORDERED.