WILLIAM E. STRADA, JR. *v.* CONNECTICUT NEWSPAPERS, INC., ET AL.
(11731)

SPEZIALE, C. J., PETERS, HEALEY, PARSKEY and GRILLO, Js.

Argued February 1—decision released May 29, 1984

314

*James A. Wade,* with whom was *Timothy F. Bannon,* for the appellant (plaintiff).

*Francis J. McNamara, Jr.,* with whom was *Robert P. Dolian,* for the appellees (defendants).

SPEZIALE, C. J. The plaintiff, William E. Strada, Jr., brought this libel action because of an allegedly libelous newspaper article published by the defendants.[1] This issue on the plaintiff's appeal is whether the trial court erred in granting the defendants' motion for summary judgment. We find no error.

In 1970, the plaintiff was elected to the state Senate for the 27th Senatorial District. The plaintiff was reelected by substantial margins of votes for three consecutive terms and during the last two terms of office he was deputy majority leader of the state Senate. In 1978, the plaintiff was defeated in his bid for a fifth term of office. On October 31, 1978, seven days before that election, the allegedly libelous article that is the subject of this action appeared in a Stamford newspaper, The Advocate.[2] The plaintiff believes that this article caused his defeat in the 1978 election and contends that the article caused him to suffer substantial pecuniary loss, injured his name and reputation, diminished his ability to practice law and his effectiveness as an elected public official, and caused his family great emotional distress and embarrassment.

---

[1] The defendants in this action are Connecticut Newspapers, Inc., which publishes The Advocate, Jay A. Shaw, President of Connecticut Newspapers, Inc. and publisher of The Advocate, Roland E. Blais, editor of The Advocate, and Anthony R. Dolan, the news reporter who authored the article.

[2] The article is set forth as an appendix to this opinion.

In his complaint the plaintiff alleged that the article contained many false statements of fact, instances of innuendo that "reflected adversely on the reputation of the Plaintiff," and incorrect attributions of quotations. After the close of pleadings and two and one-half years of discovery, the defendants moved for summary judgment. On September 28, 1982, the trial court granted summary judgment for the defendants after concluding that there was no genuine issue as to any material fact in the complaint and that the defendants were entitled to a judgment as a matter of law. The court found that "each claimed falsehood is either true, substantially true or a privileged opinion" and that "there can be no libel by innuendo if the challenged communication is true and concerns public officers and public affairs even though a false implication may reasonably be drawn by the public."[3]

The plaintiff has appealed from this judgment claiming error: (1) in the trial court's granting of summary judgment when there were genuine disputes as to material facts relating to the falsity and malicious intent of statements made in the article; and (2) in the trial court's holding that "there can be no libel by innuendo if the challenged communication is true and concerns public officers and public affairs even though a false implication may reasonably be drawn by the public."[4]

---

[3] It was conceded that the plaintiff is a public figure and therefore that he had to prove by clear and convincing evidence that the defendants published defamatory falsehoods with actual malice. See *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

[4] The plaintiff contends that the trial court erred in concluding that some of the statements alleged by the plaintiff to be false were "privileged opinion." We do not reach this issue because of our holding that the statements were either true or substantially true.

The plaintiff also contends that summary judgment was inappropriate because the defendants invoked a qualified evidentiary privilege not to identify sources relied upon in the article. Although the plaintiff is not challenging the right of a newspaper to claim a reporter's privilege not to identify confidential sources, the plaintiff argues that this qualified privilege cannot

## I

Before a party will be held liable for libel, there must be an unprivileged publication of a false and defamatory statement. *Letter Carriers* v. *Austin,* 418 U.S. 264, 284, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974). Truth is an absolute defense to an allegation of libel. *Goodrich* v. *Waterbury Republican-American, Inc.,* 188 Conn. 107, 112, 448 A.2d 1317 (1982). The plaintiff has alleged that certain passages in the article are false or give rise to false innuendo. The defendants moved for summary judgment on the ground that the statements in the article were substantially true, privileged opinion, and privileged statements concerning a public official and public events so that "there is no genuine issue as to any material fact."

Summary judgment is a method of resolving litigation when "the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to

be invoked without the defendants' incurring some kind of penalty. The plaintiff claims that "the appropriate penalty should have been a denial of defendants' summary judgment motion." The plaintiff has cited no authority that supports this position.

The plaintiff has failed to show a need for those sources. The plaintiff's request for identity of sources was denied by the trial court, *Henebry, J.,* on three different occasions upon a finding by the trial court that the plaintiff did not need the requested information. The plaintiff has not appealed from any of these rulings.

The plaintiff also argues that summary judgment is particularly inappropriate in libel actions. In *Hutchinson* v. *Proxmire,* 443 U.S. 111, 120 n.9, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979), the United States Supreme Court cautioned against the use of summary judgment in determining actual malice, which involves a state of mind. Because in the present case the trial court found that the article was either true or substantially true, it had no occasion to inquire into the defendants' state of mind. Thus, "the Supreme Court's admonition against precipitous summary judgments . . . is inapplicable." *Rinsley* v. *Brandt,* 6 Med. L. Rptr. 1222, 1232 (D. Kan. 1980), aff'd, 700 F.2d 1304 (10th Cir. 1983); see *Simonson* v. *United Press International, Inc.,* 654 F.2d 478, 481 (7th Cir. 1981).

judgment as a matter of law." Practice Book § 384; *Burns* v. *Hartford Hospital,* 192 Conn. 451, 455, 472 A.2d 1257 (1984). Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; *D.H.R. Construction Co.* v. *Donnelly,* 180 Conn. 430, 434, 429 A.2d 908 (1980); a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. Practice Book §§ 380, 381; *Burns* v. *Hartford Hospital,* supra. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. *Town Bank & Trust Co.* v. *Benson,* 176 Conn. 304, 309, 407 A.2d 971 (1978).

In support of its motion for summary judgment the defendants submitted to the trial court the deposition testimony of the plaintiff and other persons. The affidavits, depositions, and exhibits submitted by both parties showed that the statements of fact and quotations in the article were true or substantially true.

The first half of the article dealt with the application of attorney James Guarnieri for the job of assistant prosecutor. See Appendix. The article states that the plaintiff, in an "attempt" to secure the job for Guarnieri, "first" proposed Guarnieri's name and asked a local judge to "intervene" on Guarnieri's behalf as a "favor" to the plaintiff. The plaintiff challenges the truth of those statements. Our examination of the record, and particularly the plaintiff's own deposition, shows that the article is substantially true. " 'Facts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch by his piquant pen.' *Briarcliff Lodge Hotel, Inc.* v. *Citizen-Sentinel Publishers, Inc.,* 260 N.Y. 106, 118–19, 183 N.E. 193 (1932);

accord, *Miller* v. *News Syndicate Co.*, 445 F.2d 356, 358 (2d Cir. 1971)." *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 123–24.

The plaintiff testified in his deposition that he did meet with a local judge who the plaintiff knew would be involved in the selection process and did ask whether that judge could support Guarnieri for the position of Stamford assistant prosecutor. The plaintiff stated that he had the intention of assisting Guarnieri. Although Guarnieri had submitted his application prior to the plaintiff's contact with the local judge, the local judge first heard Guarnieri's name from the plaintiff. In fact, the plaintiff did not even know at the time he met with the local judge whether Guarnieri had formally applied for the position. The trial court did not err in finding that it was substantially true that the plaintiff "first" proposed Guarnieri's name.

The plaintiff contends that he did not ask the local judge "to intervene on behalf of Guarnieri." The plaintiff was present to assist Guarnieri if he could and when the local judge offered to contact the chief prosecutor the plaintiff agreed. It would be absurd not to understand that exchange as the plaintiff seeking support for Guarnieri and the local judge calling the chief prosecutor as a "favor" to the plaintiff, as the defendants stated. The trial court was correct in finding that the report of the events concerning the plaintiff's meeting with the local judge was substantially true.

The plaintiff also contends that certain statements of fact and quotations relating to events subsequent to his discussion with the local judge are false. On the basis of the evidence submitted by both parties, the trial court did not err in finding that the defendants' descrip-

tion of the events subsequent to the plaintiff's discussion with the local judge was substantially true.[5]

The remainder of the article concerned the plaintiff's relationship with reputed criminals, their businesses, or associates. The factual basis of the remainder of the

[5] In its memorandum of decision, the trial court found inter alia:

. "After the conversation with the judge, the Chief Prosecutor mentioned Guarnieri's candidacy to members of his staff one of whom reminded him of Guarnieri's heart condition. Shortly thereafter, Lt. George Mayer of the Stamford Police Department informed the Chief Prosecutor that Guarnieri was John DePoli's close personal friend and attorney. DePoli was reputed to be involved in gambling and to have connections with organized crime. Indeed, he is 'reported to be with Carlo Gambino and Vig Genovese.' State Deposition, p. 87.

"Aware that Mayer had a 'hangup' about DePoli, the Chief Prosecutor directed him to reexamine his suspicions about Guarnieri. Mayer returned later stating that Guarnieri was often seen with known gamblers and reporting that there was a gambling office in the apartment house where Guarnieri lived. Accompanying Mayer during this second report to the Chief Prosecutor was a state police officer who corroborated Mayer's allegations. The Chief Prosecutor accepted the information, but did not view it at that time as verifiable. Meanwhile, an assistant prosecutor also reported to the Chief Prosecutor that 'Hatch' Pete, a reputed gambler, had told him that Guarnieri would be appointed assistant prosecutor.

"Relying on the information provided by Mayer, his assistant and perhaps the state police, the Chief Prosecutor sent a letter to [Deputy] State's Attorney John Mulcahy in which he summarized the objections to Guarnieri's appointment concluding that he should not be recommended for the position. His objections were Guarnieri's connection with DePoli; his alleged association with gambling; Mayer's strong opposition; the 'Hatch' Pete incident; and Guarnieri's health. Mulcahy forwarded the Chief Prosecutor's letter to Judge Lexton, Chief Judge of the Court of Common Pleas. Accompanying that letter was Mulcahy's own letter which expressed his and Chief State's Attorney Gormley's objections to Guarnieri's appointment similar to those raised by the Chief Prosecutor. Mulcahy's letter further stated that it was his understanding that Judge Lexton would discuss those objections with the resident judges making the appointment. Mulcahy's official letter to the resident judges, however, only referred to Guarnieri's medical problems. Judge Lexton suggested this procedure wishing to be considerate of Guarnieri because the official letter would be a public document. Floran J. Bolan was ultimately appointed assistant prosecutor."

Our review of the record indicates that the trial court was correct in concluding, contrary to the plaintiff's contentions, that there was no genuine dispute as to any material fact as to the events subsequent to the meeting with the local judge.

article, with the exception of one factual error concerning a Superbowl trip, is likewise supported by the evidence, in large part by the plaintiff's own deposition: John DePoli is a "reputed gangster," and the plaintiff has visited his restaurant and been on trips with DePoli.[6] The plaintiff admits that he has been questioned by government agents about DePoli's activities. The plaintiff objects to the article's characterization of his relationship with DePoli as "friendly," yet repeatedly characterizes that relationship himself as "he's a friend as opposed to an enemy."[7] The plaintiff's law firm represented a company owned in part by an alleged racketeer in a legal dispute with a state agency and the plaintiff personally called the agency in an attempt to resolve the matter. The plaintiff did appear at the sentencing of an alleged major racketeer to give emotional support to the family.

"[A]ny 'deviations from or embellishments upon' the information obtained from the primary sources relied upon were minuscule and can be attributed to the leeway afforded an author who attempts to recount and popularize an . . . event." *Meeropol* v. *Nizer,* 381 F. Supp. 29, 35 (S.D. N.Y. 1974), aff'd 560 F.2d 1061 (2d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S. Ct. 727, 54 L. Ed. 2d 756 (1978). The author's job is not simply to copy statements verbatim, "but to interpret and

---

[6] The plaintiff alleges that although he has been in the presence of DePoli on certain trips, he was not "with" DePoli. On certain trips to the Superbowl, which first stopped at Las Vegas, that included the plaintiff and Stamford city officials, DePoli stayed at the same hotel as the Stamford groups; he took the same plane as the Stamford group from Las Vegas to the Superbowl game; and he was the only other Stamford person on the Superbowl flight. On at least one of these Las Vegas/Superbowl trips, DePoli was also on the same flight from New York to Las Vegas as the Stamford group. Indeed, the plaintiff himself testified that on one trip DePoli was part of the Stamford group.

[7] The plaintiff emphasizes that DePoli has never been to his home, nor the plaintiff to DePoli's home. The plaintiff's remarks go toward the degree of friendship rather than to the absence of it.

rework them into the whole." *Ryan* v. *Brooks,* 634 F.2d 726, 733 (4th Cir. 1980). "A fussy insistence upon literal accuracy 'would condemn the press to an arid, dessicated recital of bare facts.'" *Loeb* v. *Globe Newspaper Co.,* 489 F. Sup. 481, 486 (D. Mass. 1980), quoting *Time, Inc.* v. *Johnston,* 448 F.2d 378, 384 (4th Cir. 1971).

In this article comprising in excess of 1000 words, the one factual error is contained in the following excerpt: ". . . Strada and Fusaro have reportedly taken vacation trips with DePoli or been on trips arranged by DePoli associates, one of which attracted an FBI investigation.

"On this occasion, Sen. Strada and a number of city officials took a trip to Las Vegas and then to New Orleans for the Superbowl. The trip . . . was investigated by the FBI. . . ."[8]

The undisputed evidence shows, and the defendants concede, that the plaintiff never "took a trip to Las Vegas and then to New Orleans for the Superbowl." The sting of this excerpt, however, does not arise from the trip location or purpose, but rather from the fact that the plaintiff had taken a trip in some way connected with DePoli[9] "which was investigated by the FBI." The plaintiff was questioned by a government agent about the trip to Reno where the plaintiff saw DePoli.[10] Because this statement would have had no less impact on the reader had the correct locus been

---

[8] We note that in his complaint the plaintiff does not directly contest the truth of this excerpt; rather, he claims it gives rise to an adverse innuendo or inference.

[9] See footnote 6, supra.

[10] The plaintiff also testified in his deposition that "at some point, because of the tremendous publicity, where [DePoli] was reputed to be this, that and the other thing, that I ceased attending the golf outings because I'm a public servant and I had heard rumors that the FBI were in the trees taking pictures and they are investigating. . . ."

given, the statement was substantially true. Where the "main charge, or gist, of the libel" is true, minor errors that do not change a reader's perception of the statement do not make the statement actionable. *Goodrich v. Waterbury Republican–American, Inc.,* supra, 113. "The issue is whether the libel, as published, would have a different effect on the reader than the pleaded truth would have produced." Id.

The record substantiates the factual bases for the defendants' article and the trial court did not err in concluding that each claimed falsehood of fact or quotation was either true or substantially true.

## II

The plaintiff's next claim of error goes to "numerous stylistic and journalistic innuendos and inferences . . . which reflected adversely on the reputation of the Plaintiff." We have already concluded that the trial court was correct in its finding that the article was composed of true or substantially true statements. The trial court did not decide whether a reasonable reader might draw a false inference from certain statements as alleged by the plaintiff. Rather, the trial court held that "there can be no libel by innuendo if the challenged communication is true and concerns public officers and public affairs even though a false implication may reasonably be drawn by the public."

Innuendo or inference may result merely from the tone or "slant" of an article, or innuendo or inference may also result from the failure to present the whole picture. In *Memphis Publishing Co.* v. *Nichols,* 569 S.W.2d 412 (Tenn. 1978), a newspaper article correctly stated that the plaintiff had been shot when she had been found with another woman's husband. The article neglected to report, however, the additional fact that the plaintiff and the other woman's husband were at a social gathering, the several members of which

included the plaintiff's husband. The clear inference from the article was an adulterous affair; the additional fact clarified the plaintiff's position as an innocent bystander. But in the present case, the plaintiff seeks to recover from a publication where all the underlying and stated facts have been proved to be true, or substantially true, claiming that the "slant" of the article gives rise to allegedly false and defamatory implications. Unlike *Memphis Publishing Co.* v. *Nichols,* supra, the plaintiff here has not alleged, nor has our examination of the record disclosed, the existence of additional material facts which, if reported, would have changed the tone of the article.[11] In the absence of such undisclosed facts, first amendment considerations dictate that an article concerning a public figure composed of true or substantially true statements is not defamatory regardless of the tone or innuendo evident.

The goal of nurturing a free and active press in the political arena mandates denial of recovery by a public figure where the allegation of defamation "depends fundamentally on an interpretation of various aspects of the broadcast, not on anything directly said in it." *Pierce* v. *Capital Cities Communications, Inc.,* 576 F.2d 495, 500 (3d Cir.), cert. denied, 439 U.S. 861, 99 S. Ct. 181, 58 L. Ed. 2d 170 (1978).

The cases in other jurisdictions that have considered this issue support this view. Recovery was denied in *Loeb* v. *New Times Communications Corporation,* 497 F. Supp. 85 (S.D.N.Y. 1980), where the court specifically found that "[t]he authors' clear intent was to portray an overwhelmingly negative picture of Loeb by presenting purported examples of his ridiculous idiosyn-

---

[11] The only possibly relevant factor that the article neglected to report was the plaintiff's offer to withdraw his support of Guarnieri if the chief prosecutor thought Guarnieri's candidacy was presenting a problem. The trial court was correct in not finding the defendants' omission of this fact to be material as its inclusion would not have changed the slant of the article.

cracies and prejudices, shady political maneuverings, and dishonest reporting practices." Id., 88–89. In spite of the "suggestive context," the article was constitutionally protected because the "defendants have reported the facts accurately and carefully, avoiding the defamatory conclusion which Loeb claims they intended the reader to draw." Id., 91.

In *Mihalik* v. *Duprey,* 11 Mass. App. 602, 417 N.E.2d 1238 (1981), each individual statement published in a "riddle" about a public figure was true. The court held that recovery could not be had "merely because in the aggregate they have an insinuating overtone." Id.

In a Louisiana case the public official plaintiff admitted "there was nothing factually incorrect in the article. However, 'the way people looked at the thing' he was accused of misusing state funds for personal benefit." *Schaefer* v. *Lynch,* 406 So. 2d 185, 188 (La. 1981). The court there held that "truthful statements which carry a defamatory implication can be actionable. However, that is only true in the case of private citizens and private affairs. Even false statements about public officials are constitutionally protected unless known to be false or printed with a reckless disregard for the truth. *New York Times Co.* v. *Sullivan,* [376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)]. It surely follows that all truthful statements are also constitutionally protected. Even though a false implication may be drawn by the public, there is no redress for its servant. Where public officers and public affairs are concerned, there can be no libel by innuendo."[12] Id.

---

[12] The cases cited by the plaintiff are not to the contrary. There is dicta in the case of *Dunlap* v. *Philadelphia Newspapers, Inc.,* 301 Pa. Super. 475, 448 A.2d 6 (1982), that true facts leading to a false inference are actionable. In that case, however, where the article correctly reported that the plaintiff acknowledged that he was "more than likely" the officer photographed for a story concerning police corruption, the evidence showed that the plaintiff was not in fact the officer in the photograph. Thus, *Dunlap*

Still another court held that: "Unless he can successfully identify particular false statements that, taken in context, create the impression he is a 'throwback to the middle ages,' [the plaintiff doctor] cannot complain." *Rinsley v. Brandt*, 700 F.2d 1304, 1310 (10th Cir. 1983). A publisher cannot be responsible for every strained interpretation that a plaintiff might attribute to its words. See *Lewis v. Time, Inc.*, 710 F.2d 549, 553–56 (9th Cir. 1983); *Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 765 (D.N.J. 1981).

"The Court is aware that any article replete with snide innuendos can be hurtful to a subject, and indeed may damage him in his business reputation. But if he is a public figure, then he must bear the risk of such publicity as the price he pays for conducting activities or business in the public arena." *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1352 (S.D.N.Y. 1977). "An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers or government is not strictly limited to the formal discharge of official duties." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); see *Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964). The defendants have no obligation to place the plaintiff in the most favorable light. *Rinsley v.*

is an example of innuendo resulting from the failure to print *all* the relevant and true facts. See *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978).

Another case heavily relied upon by the plaintiff; *Cianci v. New Times Publishing*, 639 F.2d 54 (2d Cir. 1980); holds only that specific accusations of criminal conduct (in that case, rape and obstruction of justice) are not protected as statements of opinion nor protected by the privilege of neutral reportage or the common law privilege of fair report. Because the truth of the article remained an issue in that case, the court never reached the question of whether false innuendo from true facts would be actionable.

*Brandt,* 6 Med. L. Rptr. 1222 (D. Kan. 1980), aff'd, 700 F.2d 1304 (10th Cir. 1983); *McIntire* v. *Westinghouse Broadcasting Co.,* 479 F. Supp. 808 (D. Mass. 1979).

When any inference or innuendo does not arise from the omission of material facts, but rather from the editorial choice of layout, the plaintiff may not recover for libel by innuendo. The media would be unduly burdened if, in addition to reporting facts about public officers and public affairs correctly, it had to be vigilant for any possibly defamatory implication arising from the report of those true facts. "[T]he pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." *New York Times Co.* v. *Sullivan,* supra, 278; see *Washington Post Co.* v. *Keogh,* 365 F. 2d 965, 968 (D.C. Cir. 1966).

The result we reach in this case, which undeniably may have a harsh impact on those persons who are public figures, is a corollary to the privilege accorded false statements concerning public officials published without malice. Just as the goal of a free and active press protects false statements of fact regarding public figures published without malice, so too must the law protect truthful facts that may give rise to false innuendo or inference. " 'It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of [candidates] whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great.' " *New York Times Co.* v. *Sullivan,* supra, 281, quoting *Coleman* v. *MacLennan,* 78 Kan. 711, 724, 98 P. 281 (1908).

Under the circumstances of this case, the trial court did not err in concluding as a matter of law that there could be no libel by innuendo of a public figure where the challenged communication is true.

There is no error.

In this opinion the other judges concurred.

### Appendix

The alleged libelous article was printed in the Stamford Advocate newspaper on October 31, 1978:

## "Strada's court post role revealed
*by Anthony R. Dolan*
*Advocate Staff Reporter*

"State Sen. William E. Strada Jr.'s, D-27th, attempt to win a prosecutor's job for a Stamford attorney failed after a local prosecutor and police official objected to the lawyer's close relationship with an important organized crime figure here, an Advocate investigation shows.

"According to sources close to the controversy over the 1976 appointment, the possible naming of the local lawyer, James Guarnieri, now deceased, to an assistant prosecutor's post caused consternation among police and prosecutors because of Guarnieri's close ties to John 'Stoogie' DePoli—a well known organized crime figure here. Friendly with Strada and the senator's law partner, John Fusaro, DePoli is believed by state and federal law enforcement sources to run Stamford's largest gambling syndicate and is listed in numerous law enforcements reports as an associate of the Gambino crime family of New York.

"In an off-the-record conversation Monday, Sen. Strada discussed the contents of this story and said he would prepare a statement for release today. This

morning, however, Strada declined comment. He said that he had met with his campaign advisors who were 'shocked' that an article would be written about a local citizen who is now deceased.

" 'Believe me, if the article is printed, there will be plenty of comment.' Strada added.

"The senator also said he could not write a response to an article he had not yet seen. When asked if he would like a fully detailed description of the contents of the story, Strada said this would not influence his decision to refrain from commenting at the present time.

"At the time of the proposed Guarnieri appointment, the police officers and prosecutors were concerned that a close personal friend and counsel to the city's most important gambling boss would be placed, through political influence-peddling, into a sensitive judicial post—one with plea bargaining powers as well as access to search warrant information.

"Described by associates as 'deeply concerned' about the matter, Martin L. Nigro, chief prosecutor in Stamford at the time of the proposed appointment, wrote a letter to the chief administrative judge of the Common Pleas Court listing police objections to the appointment as well as his own misgivings, according to reliable sources.

"Nigro reportedly decided to write the letter shortly after one of his assistants was approached by a well-known gambler who boasted that the appointment of the attorney had been arranged.

"The local police official, Lt. George Mayer, head of the Stamford Police Department's gambling and narcotics squad, was a prime mover in assembling the case against Guarnieri and complained directly to Chief State's Attorney Joseph Gormley about the proposed appointment.

"Guarnieri's name was first proposed when Sen. Strada, a deputy majority leader of the state senate and former chairman of the legislature's general law committee, appeared in the office of a local judge and asked him to intervene on behalf of Guarnieri. The judge then called prosecutor Nigro and asked that Guarnieri be considered for the post as a favor to Strada.

"Shortly after the call, Nigro learned from Mayer that Guarnieri was frequently observed by local police at meetings between DePoli and some of DePoli's subordinates who run illegal gambling outlets throughout the city, according to police sources.

"DePoli is known to be under investigation by state and federal law enforcement agencies. In addition to four gambling arrests as well as one recent arrest on fraud charges, DePoli is frequently identified as an important local mob figure in federal and state organized crime reports to which The Advocate has obtained access.

"The effort to appoint Guarnieri failed after Gormley, who has an informal veto power in such appointments, was approached in Bridgeport by Lt. Mayer with the information about Guarnieri's relationship with DePoli. Prosecutor Nigro also wrote his letter to Judge Roman Lexton, chief administrative judge of the Common Pleas Court, in which Nigro outlined police objections as well as his own concern about the fragile health of Guarnieri who suffered from a heart condition.

"The attempt by Sen. Strada to have Guarnieri appointed is one of several incidents, according to federal and state law enforcement sources, in which the senator and Fusaro have allegedly tried to influence state or federal agencies on behalf of businesses or close associates of reputed organized crime figures. Most of these attempts have apparently sprung from social and

professional relationships that Strada and Fusaro had with these individuals, The Advocate investigation also shows.

"These relationships have raised questions in the minds of law enforcement officials who doubt the propriety of such associations between a major state official and the organized crime figures—their associates or their businesses.

"In addition to the controversy over the prosecutor's appointment, these questions stem from the Strada & Fusaro law firm's representation of a trucking company—owned in part by a local racketeer—in a legal battle with a state agency and, in another case, the senator's appearance in a New Haven federal courtroom for purposes of 'emotional support' at the sentencing hearing of a major racketeer prosecuted by the U.S. Department of Justice's Organized Crime Strike Force.

"Several sources with first-hand information of Sen. Strada's dealings with mob figures or their close associates agreed to talk to The Advocate following the Fusaro's indictment by a federal grand jury that heard evidence presented by the federal organized crime strike force in Rhode Island. Fusaro was found innocent last week in a Rhode Island trial on the charges.

"The indictment charged that Fusaro attempted to hide from IRS investigators a $25,000 payment to his law firm from a dog racing and jai lai promoter shortly after Strada introduced the bill that legalized those gaming activities in Connecticut. The government has not charged that Strada introduced the legislation as a direct result of payments to his law firm from the Rhode Island promoter.

"Among other incidents that law enforcement sources said disturbed them about the propriety of Strada and Fusaro's actions are:

"Besides the attempted Guarnieri appointment, Strada and Fusaro have also had a social relationship with DePoli. In addition to frequent visits to the Regnecy [sic] Restaurant in Shippan, which is owned and operated by DePoli, Strada and Fusaro have reportedly taken vacation trips with DePoli or been on trips arranged by DePoli associates, one of which attacted [sic] an FBI investigation.

"On this occasion, Sen. Strada and a number of city officials took a trip to Las Vegas and then to New Orleans for the Superbowl. The trip, which was investigated by the FBI, was arranged by a travel agency in Bridgeport which is used as a part-time office and run by close relatives of a racketeer who has been described by federal sources as a 'made' or officially inducted member of the Gambino crime family and who frequently has been seen meeting with DePoli.

"It was also learned that federal investigators have questioned Strada and others about DiPoli's [sic] activities during at least one of the gambling junkets.

"In addition to the vacation trips, Fusaro became so familiar a figure at the Regency that an impromptu party was held for him on the night of his indictment.

"Strada, on Jan. 17, 1976, sat for more than two-and-a-half hours in a federal courtroom in New Haven at a sentencing hearing for Anthony Michael 'Ginzo' Zezima, a local Stamford racketeer. Zezima was prosecuted by attorneys with the Northeast Organized Crime Strike Force after an FBI wiretap showed Zezima was running a major gambling operation here. Federal sources believe Zezima and DePoli had split the gambling action in Stamford, with Zezima maintaining ties with the Genovese crime family in New York City.

"Asked why a prominent state senator would spend a morning at the sentencing hearing of a well-known

racketeer, Strada said at the time that a member of the family works in his law office and said he was there 'to give the family some emotional support.'

"When this comment was published the senator reacted angrily, calling a reporter and arguing that his presence at the hearing was neither relevant nor newsworthy.

"Strada intervened in 1976 with a state agency on behalf of MST trucking company, a firm owned in part by the late Joseph Tamburri, a member of the Stamford underworld with a long criminal record. The MST firm, two of whose vice presidents (including Tamburri) were arrested and convicted in 1973 on charges of defrauding the City of Stamford, was charged by state Department of Environmental Protection investigators in 1975 with dumping ash on two North Stamford properties. The agency filed charges against the firm, alleging that it had engaged in serious, illegal health and environmental practices.

"A DEP source said, at the time, that Strada had called the DEP and, in a move to have the charges dropped, attempted to exert political presure [sic] on the agency. Sen. Strada has denied, however, that his law firm attempted to apply any political pressure but merely made a call to the DEP as MST's legal representative.

"A spokesman for the law firm also said, at the time, that he saw no conflict of interest in a state senator's law firm pleading for a third party against a state agency whose programs and budgets the legislature regulates and approves.

"When Strada attended Tamburri's funeral shortly after the racketeer was shotgunned to death in February of 1976, he also objected to a news story that mentioned his presence at the racketeer's funeral."