[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT
In this action the plaintiff law firm, Updike Kelly Spellacy, P.C. ("Updike Kelly"), seeks to recover $915,825.09, plus interest for outstanding fees and costs incurred in representing the 100 former clients in an action against The Airline Pilots Association-International ("ALPA") and certain union officials. Updike Kelly also represented some of the defendants in connection with a separate age discrimination claim, and in other litigation. Updike Kelly's claims against the CT Page 3695 defendants sound in breach of contract and quantum meruit. Updike Kelly has asserted that the defendants are jointly and severally liable for the outstanding debt.
By a motion dated October 30, 2000, certain defendants seek a partial summary judgment on the issue of joint and several liability. The defendants claim that they are not jointly and severally liable for the debt but are only responsible for their pro rata share of the debt.
Statement of Facts
Prior to December 1991, each of the defendants was employed by Pan American World Airways ("Pan Am") as either a Captain, First Officer or Flight Engineering Officer. Amended Complaint, First Count, ¶ 102. Beginning in the fall of 1991, and continuing thereafter the defendants and other present and former employees of Pan Am (the "Pilots") executed a written agreement with Attorney Scott Karsten whereby Attorney Karsten agreed to represent the Pilots in a breach of fair representation claim under the Railway Labor Act against ALPA and certain union officials and the defendants agreed to pay Attorney Karsten certain stated fees and expenses incurred in connection with the litigation ("Karsten Agreement"). Knowing that the union and union officials would vigorously defend the claims, and that the pursuit of such claims would be money and — time intensive, the Pilots banded together to pursue their action against the union.
The Karsten Agreement consisted of a letter to defendant, Stewart Beckett, which identified the legal proceedings that were contemplated and the agreed upon hourly rates for legal fees and costs. The Karsten Agreement expressed an intention that, in the event Attorney Karsten affiliated himself with other counsel for purposes of the litigation, the parties would attempt to obtain the same fee arrangements with new counsel. The Karsten Agreement set forth the proposed fee arrangement between Attorney Karsten and the Pilots' group:
 We propose to conduct these proceedings from initiation through trial, if necessary, on behalf of all persons in your group who indicate by countersigning this letter their desire to participate. In view of uncertainties of recovery in this type of litigation, the need to devote substantial resources to its proper prosecution and the likely duration and complexity of the proceedings, we consider it fair to all concerned to alter the typical compensation arrangements of either a full usual hourly rate or a contingency fee CT Page 3696 comprised of one-third of any gross monetary recovery to the members of represented classes. Instead, as discussed, we propose to reduce my 1991 usual hourly rate of $175 to $100 per hour, with annual increases in that reduced rate effective January 1 of 1993 and each calendar year thereafter, in the amount of $10 per hour. In addition to that reduced hourly rate, we would receive a contingency fee in the amount of twenty percent (20%) of any gross monetary recovery by settlement or verdict. . . . The participants will, as is customary, remain responsible for expenses incurred during the course of the litigation. Regular accountings of expenditures, fees and activities will of course be provided to you or to your designee.
Karsten Agreement, pp. 1-2.
The Agreement further provided that all bills would be sent to defendant Stewart Beckett or his designee; not to each individual defendant. The letter requested defendant Beckett to distribute the terms of the Agreement to the "participating members [of his group]." The Agreement also contained a form whereby each member of the group could indicate his willingness to participate in the litigation pursuant to the terms and conditions of the letter.
Shortly thereafter, the Pilots (including each defendant herein) executed the form indicating his willingness to be a member of the group pursuing the litigation against ALPA and to be bound by the fee arrangements set forth in the Karsten Agreement.
In December 1991 and early January 1992, Attorney Karsten and Attorney Suzann Beckett approached Updike Kelly to discuss the Pilots' claims and the possible retention of Updike Kelly to assist in the prosecution of the claims. The initial discussions focused on Updike Kelly's ability to provide the resources available to a large firm that would be needed to handle a complex case with such a large number of plaintiffs.
Following these discussions, on January 7, 1992, Attorneys Karsten and Beckett, acting as counsel for and agents of the defendants, entered into an agreement with Updike Kelly in which Updike Kelly agreed to assist in the representation of the Pilots in connection with their claims against ALPA and union officials. The terms of Updike Kelly's agreement were similar to those contained in the Karsten Agreement (the "UKS Agreement").
The terms of the UKS Agreement relating to legal fees essentially CT Page 3697 mirrored those contained in the Karsten Agreement. The UKS Agreement provided that payment to Updike Kelly would consist of two parts: payment of periodic billings at a discounted hourly rate and, if appropriate, payment of a contingency fee.
Between January 1992 and May 1, 1997, Updike Kelly represented the defendants in hotly contested litigation against ALPA and union officials. The retainer letters signed by the defendants and Updike Kelly do not specifically indicate that the defendants would be liable for their fees only on a pro rata basis, nor do they specifically indicate that the defendant clients were to be jointly and severally liable for attorneys fees and costs. The parties have submitted various affidavits and other documents which indicate that there are material facts at issue, including whether Updike Kelly believed that the defendants were only responsible for payment of their attorneys fees on a pro rata basis.
The Pilots ultimately tried their claims to a jury in the United States Court for the Eastern District of New York.[1] A verdict in favor of most of the Pilots was obtained on the issue of liability. Thereafter, the parties pursued mediation in an effort to resolve the damages portion of the case. The Pilots valued their claims in excess of $100 million after the verdict.
To ensure that all Pilots who filed against ALPA collected a damage award, those pilots who had obtained a verdict on liability in their favor, agreed to share a portion of the overall damages award with those pilots who had not obtained a verdict in their favor. Under this agreement, those pilots who lost at trial were promised a fiat rate portion of the overall damages awarded to the prevailing Pilots.
During the course of its more than five year representation of the defendants, Updike Kelly issued periodic bills to the pilots' designee which were periodically paid. However, at the conclusion of Updike Kelly's representation of the defendants, there remained outstanding $915,820.09 in fees and costs. The defendants failed to pay these fees and this action ensued.
Discussion of Law and Ruling
Practice Book § 17-49 (formerly § 384) provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Connecticut Bank Trust Co. v. Carriage Lane Associates,219 Conn. 772, 780-81, 595 A.2d 334 (1991); Lees v. Middlesex Ins. Co., CT Page 3698219 Conn. 644, 650, 594 A.2d 952 (1991). Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434,429 A.2d 908 (1980); a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact, together with the evidence disclosing the existence of such an issue. Practice Book §§ 17-45, 17-46; Burns v. Hartford Hospital,192 Conn. 451, 455, 472 A.2d 1257 (1984). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. Town Bank Trust Co. v. Benson,176 Conn. 304, 309, 407 A.2d 971 (1978); Strada v. ConnecticutNewspapers, Inc., 193 Conn. 313, 317, 477 A.2d 1005 (1984). The test is whether a party would be entitled to a directed verdict on the same facts. Batick v. Seymour, 186 Conn. 632, 647, 443 A.2d 471 (1982); NewMilford Savings Bank v. Roina, 38 Conn. App. 240, 243-44, 659 A.2d 1226
(1995).
Summary judgment should only be granted if the pleadings, affidavits and other proof submitted demonstrate that there is no genuine issue as to any material fact. Scinto v. Stain, 224 Conn. 524, 530, cert. denied,114 S.Ct. 176, 126 L.Ed.2d 136 (1993); Connell v. Colwell, 214 Conn. 242,246, 571 A.2d 116 (1991). Summary judgment is "designed to eliminate the delay and expense of litigating an issue where there is no real issue to be tried." Wilson v. City of New Haven, 213 Conn. 277, 279, 567 A.2d 829
(1989).
In considering the intent of parties to a contract evidenced by multiple writings, "all of the writings should be considered and an endeavor made to ascertain the expressed intent of the contract as a whole." Schubert v. Ivey, 158 Conn. 583, 587, 264 A.2d 562 (1969). "Under common-law rule, where two or more promissors enter into an agreement with a third party for one performance, there is a presumption that the promissors are contracting jointly in the absence of words of severance in the contract." Id. at 587-88; see also Restatement (Second) of Contracts, § 288 (1979). Connecticut law is in accord with this common law rule. 158 Conn. at 588. The effect of such a joint obligation, as distinguished from a several obligation, is that each joint promissor is liable for the whole performance jointly assumed.
Under the common-law rule in this state, there is a presumption of joint and several liability of the defendants here. There are issues of fact with respect to the intent of the parties which may rebut the presumption. However, those issues must be decided at trial.
For the foregoing reasons, the Motion for Summary Judgment is denied. CT Page 3699
By the court,
Aurigemma, J.