[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
By complaint dated September 13, 1994, and subsequently amended by the amended complaint dated January 19, 1995, the plaintiffs, Joseph Geladino, Ann Marie Matta Geladino ("Matta"), Trisha Geladino, Kimberly Rogers, Marcia Mayo, William Cass, Nancy Toffolon, Village Builders Developers, Inc. CT Page 11024 ("VBD"), and Village Real Estate Company ("Village Real Estate"), brought a thirty-five count action alleging fraudulent misrepresentation, negligence and unfair trade practices against the defendants, Anthony Pizzitola, Marshall Bullock, Ralph Mann, Robert Morton, Albert Dudzik, Jr., Walter Hushak, Juanine DePaola, Michael Karabin, David Kelley, Frederick Kuhr, Joseph LaPorte, Andrew Mead, and Dennis Stanek. On February 28, 1995, all of the defendants, except Bullock, moved for summary judgment as to the counts asserted against them.
The controversy between the parties has a long litigious history. The court therefore will set forth the general facts forming the basis for the plaintiffs' action and then set forth the controversy's lengthy procedural history.
I. FACTS
A. General Facts
The complaint alleges the following facts. At all relevant times the defendants were employees, officers and/or directors of the Southington Savings Bank ("Southington Bank"). Bullock, arguably the main character in this saga, was the chief loan officer and Senior Vice President at Southington Bank until his employment was terminated in November 1990.
While employed as Southington Bank's chief loan officer, the plaintiffs allege that Bullock used his position as Southington Bank's chief loan officer in order to manipulate and coerce the plaintiffs, convincing them to participate in or eschew certain transactions based solely upon Bullock's own personal economic gain. What transpired during and as a result of Bullock's alleged self-dealing is the catalyst for the plaintiffs' lawsuit.
The complaint alleges that Bullock's alleged self-dealing began in July of 1988, when the plaintiff Cass was planning to sell certain undeveloped property he owned to a third party for $540,000.00. When the proposed sale came to the attention of Bullock, the complaint alleges that Bullock told Cass that the property would retrieve more on the market if it was developed. Further, the complaint alleges that Bullock informed Cass that he could help Cass develop the property. Bullock promised Cass that he could provide Cass with the funds to develop the property from Southington Bank, CT Page 11025 or, in the alternative, from another institution. Cass relied on Bullock's representations and abandoned the negotiations to sell the property to the third party.
The plaintiffs further allege that, as promised, Bullock initiated a loan application for Cass with a West Hartford bank. During the pendency of the application, however, the complaint alleges that Bullock approached Cass and demanded fifty percent (50%) of the anticipated net profits from the sale of the developed property in return for Bullock's assistance in procuring the construction loan. Cass refused Bullock's demand. Consequently, Bullock withdrew the West Hartford loan application. Cass attempted to sell the property, however, the original third party was no longer interested and Cass could not find another bona fide purchaser. Thus, the complaint alleges that Cass lost the opportunity to profitably sell his property because Bullock wrongfully withdrew the loan application after Cass refused to capitulate to Bullock's extortive demands.
The complaint further alleges that on July 29, 1988, Joseph Geladino and Matta purchased a commercial condominium unit with a $240,000.00 mortgage loan from Southington Bank. Joseph Geladino and Matta owned and operated a video business from the condominium unit. In January of 1990, they sold the video business to a third party and leased to him the condominium unit. The third party financed the purchase price of the video business through a loan from Southington Bank.
Several months after the sale, the third party/tenant stopped making rental payments to Joseph Geladino and Matta, and defaulted on his loan payments. Bullock approached the third party/tenant, represented that he was acting on behalf of Southington Bank, and coerced the tenant to turn the operation of the video business over to Bullock. The complaint alleges that Bullock operated the business for five weeks until Southington Bank transferred control of the business back to Joseph Geladino and Matta. The complaint alleges, however, that while Bullock was wrongfully in possession of the business, bills remained unpaid and inventory and supplies disappeared.
The next incident of claimed self-dealing occurred in March 1989, when the complaint alleges that plaintiffs Cass and Mayo were interested in purchasing a single lot on Mark Drive in Southington, Connecticut. Cass and Mayo therefore filed CT Page 11026 with Southington Bank an application for a mortgage loan to purchase the single lot. Bullock allegedly contacted Cass and Mayo and falsely informed them that Southington Bank would not approve a mortgage on the single lot in question. Bullock allegedly advised Cass and Mayo, however, that Southington Bank would lend them funds to purchase and develop lots 12 and 13 on Mark Drive. The complaint also alleges that Bullock deceived Cass and Mayo because he received a kickback from the seller of lots 12 and 13.
Cass and Mayo relied upon Bullock's representation that Southington Bank would not finance the purchase of the single lot and instead purchased lots 12 and 13 with a mortgage loan in the amount of $246,000.00. The complaint further alleges that Bullock procured an additional unsecured personal loan for Cass and Mayo for the purchase deposits on the lots 12 and 13.
Cass and Mayo began to build a duplex on one of the lots. The mortgage proceeds, however, only provided enough funds to construct part of the duplex. Therefore, Cass and Mayo were forced to expend personal funds to complete its construction.
Thereafter, the complaint alleges that the original $246,000.00 mortgage loan fell into arrears. On September 21, 1990, the plaintiffs claim that Bullock convinced Mayo to take out a second mortgage on her personal residence in the amount of $71,000.00. The second mortgage was used to secure the unsecured personal loan and pay the interest due on the first mortgage.
The complaint alleges that Cass and Mayo subsequently applied for additional financing to develop the second lot. Bullock, however, was no longer employed with Southington Bank and Southington Bank refused to provide additional funds. Consequently, the complaint alleges that Cass and Mayo were left with debts that exceeded the value of their property.
The complaint further alleges that on January 5, 1989, Bullock formulated a plan to generate real estate sales and commissions. On said date, Bullock promised Joseph Geladino, Matta, Cass, Mayo, and Toffolon that if they started a real estate company he would use his influence and position as the chief loan officer at Southington Bank to generate real CT Page 11027 estate sales and commissions for the company. Relying upon Bullock's promise, they created Village Real Estate. The complaint alleges that Bullock was an officer and stockholder of Village Real Estate; however, Bullock kept his part ownership of and involvement with Village Real Estate a secret from his superiors at Southington Bank.
The complaint alleges that Bullock further convinced Joseph Geladino, Matta, Cass, Mayo and Toffolon to purchase a commercial condominium unit to use as an office for the company. On January 30, 1989, they mortgaged the condominium unit to Southington Bank for a loan in the amount of $124,000.00.
Shortly after opening for business, Village Real Estate was unable to meet its bills and obligations. Thus, on April 27, 1989, the complaint alleges that Bullock procured an additional $25,000.00 loan for the company. The complaint alleges that Bullock subsequently increased and rewrote the loan in order to conceal from Southington Bank his ownership of and personal involvement with Village Real Estate.
The plaintiffs allege that Bullock never provided the customers for Village Real Estate as promised. Instead, the complaint alleges only two instances where Bullock used his position and influence to generate real estate sales and commissions for Village Real Estate. The first occurred around December 1988, when the complaint alleges that in order to generate a real estate sale and commission for Village Real Estates, Bullock fraudulently processed a $250,000.00 mortgage loan for Toffolon and Jeffrey for a lot in Plantsville, Connecticut. The complaint alleges that Bullock instructed Toffolon and Jeffrey to sign an incomplete loan application. Later, Bullock allegedly inserted fictitious income figures for Toffolon and Jeffrey on the loan application in order to secure approval for the $250,000.00 mortgage note. Based on their actual incomes, however, Toffolon and Jeffrey could not meet the loan payments and it eventually fell into arrears. To conceal the loan's delinquent status, the complaint alleges that Bullock closed a second $15,000.00 mortgage for Toffolon on July 10, 1990. The complaint alleges that as a result of these loans Toffolon has become indebted beyond her means and faces the possibility of losing the equity in her home.
The second time Bullock allegedly used his position to generate a sale for Village Real Estate was on or about May CT Page 11028 1989, when Bullock persuaded VBD to purchase a parcel of land that was comprised of 38-1/2 acres.[1] Allegedly, Bullock convinced VBD to subdivide the land and develop it into separate lots in order to generate sales for Village Real Estate. In order to assist VBD, and thus, Village Real Estate, the complaint alleges that Bullock approved VBD's 1.2 million dollar loan application, even though VBD never submitted information concerning its financial status or an appraisal on the 38-1/2 acres. The loan was secured by a first mortgage dated May 5, 1989.
Faced with cash flow problems throughout the subdivision process, Joseph Geladino, Matta, Rogers, Trisha Geladino and VBD personally and in their corporate capacity were forced to borrow additional funds from Southington Bank in order to make interest payments on the 1.2 million dollar first mortgage. In all, the complaint alleges that they borrowed $250,000.00 through unsecured notes,[2] refinanced a residence in the amount of $400,000.00 on November 29, 1990, and mortgaged previously unencumbered lots in the amount of $261,533.22 on August 29, 1990. The complaint alleges that the plaintiffs procured all of these loans at the insistence of Bullock because Bullock feared that his involvement with the plaintiffs would be discovered by his superiors at Southington Bank.
Bullock was dismissed as a loan officer in November 1990. Defendants Mann, the Chief Executive Officer and President of Southington Bank, and Morton, the Chief Operating Officer and Executive Vice President, subsequently handled all business involving the plaintiffs. Southington Bank refused to loan the plaintiffs additional funds for the subdivision project. The complaint alleges that on August 23, 1990, without any prior notification or authorization, Mann placed a freeze on Joseph Geladino and Matta's personal accounts and certificates of deposit as security for the outstanding interest payments and unsecured loans. Additionally, on August 29, 1990, Mann further induced Joseph Geladino and Matta to secure the same interest payments and unsecured loans by mortgaging two previously unencumbered lots.[3] The complaint alleges that Joseph Geladino and Matta discovered that Mann placed a freeze on their accounts a few weeks after they mortgaged the two unencumbered lots.
Negotiations continued between the plaintiffs and Southington Bank. In January 1991, the plaintiffs claim that CT Page 11029 Mann and Morton promised that Southington Bank would provide additional funding for the 38-1/2 acre subdivision if the plaintiffs obtained approval to re-subdivide the parcel. After the plaintiffs obtained re-subdivision approval, however, Mann and Morton allegedly refused to provide the additional funding. At this point, the string of lawsuits commenced.
B. Procedural History[4]
The first lawsuit based upon the allegations as set forth above was filed in federal court by Joseph Geladino, Matta, Cass, Mayo, Toffolon, VBD, and Village Real Estate by complaint dated October 25, 1991. See Def's Memorandum of Law, Exh. 7. On June 5, 1992, the federal action was dismissed. See id., Exh. 9.
Between January and March 1992, Southington Bank commenced eighteen foreclosure actions against the plaintiffs.[5]
The actions were consolidated, and in the summer of 1993, they were tried over a period of 15 days. Southington Bank was successful in 17 of the 18 foreclosure actions. See id., Exh. 13 and 14 Both Southington Bank and the plaintiffs, defendants in the foreclosure actions, appealed.
In June 1993, shortly before the trial of the consolidated cases, the plaintiffs filed a lawsuit (1993 action) against the defendants in the New Britain Superior Court. See id., Exh. 15. On August 6, 1993, the defendants filed a request to revise. See id., Exh. 16.
In April 1994, the New Britain Superior Court placed the 1993 action on the dormancy list. On June 24, 1994, the 1993 action was dismissed for dormancy. See id., Exh. 18. On September 12, 1994, the court sustained the defendants' objection to the plaintiffs' motion to reopen the dismissal. See id., Exh. 19.
The trial transcript of the consolidated foreclosure actions was not completed until April 24, 1994. The plaintiffs' brief on appeal was not due until June 6, 1994. On June 2, 1994, Toffolon filed a Chapter 7 bankruptcy proceeding in the U.S. Bankruptcy Court in Hartford, Connecticut. See id., Exh. 20. On July 19, 1994, at approximately 11:35 a.m., the U.S. Bankruptcy Court granted Southington Bank relief from the automatic bankruptcy stay. See id., Exh. 21. At approximately CT Page 11030 12:33 p. m., Southington Bank's counsel informed the clerk for the Connecticut Appellate Court via telephone that relief from the automatic stay had been granted. See id., Exh. 30. At 4:20 p. m. on the same day, another plaintiff, Cass, filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court at Bridgeport, Connecticut. See id., Exh. 23.
On July 20, 1994, at approximately 12:34 p. m., Southington Bank's counsel filed a copy of the U.S. Bankruptcy Court's Order Granting Relief From Automatic Stay in the Toffolon bankruptcy proceeding. At approximately 2:05 p. m., the plaintiffs filed Cass' affidavit with the New Britain Superior Court stating that Cass filed a bankruptcy petition in Bridgeport on July 19, 1994. Immediately thereafter, the plaintiffs filed a time-stamped copy of the affidavit with the Clerk of the Appellate Court. The Appellate Court, however, apparently unaware of Cass' bankruptcy petition, dismissed the consolidated foreclosure appeals because the defendants/appellants failed to file their brief on or before July 5 as ordered by the court.
The plaintiffs successfully moved to open the appellate dismissal. The plaintiff Cass further filed a motion for contempt with the bankruptcy court in Bridgeport. See id., Exh. 26. Said contempt motion has not been heard.
On September 13, 1994, the plaintiffs filed the present action. On December 16, 1994, the U.S. Bankruptcy Court at Bridgeport granted Southington Bank relief from the stay in the Cass petition to allow it to exhaust all state court proceedings up to the setting of law days and execution on judgment. See id., Exh. 27.
On January 19, 1995, the plaintiffs moved to amend the present action to add counts 33-35. These three additional claims relate to events in 1994 concerning the procedural history.
II. DISCUSSION
Summary judgment "shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 384. In ruling on the summary judgment motion, "the trial court must view the evidence in the light most favorable CT Page 11031 to the nonmoving party"; Connecticut Bank Trust Co. v. CarriageLane Associates, 219 Conn. 772, 781, 595 A.2d 334 (1991); and "the trial court [is] limited to deciding whether an issue of fact exist[s], [and may] not try that issue if it [does] exist." Batick v. Seymour, 186 Conn. 632, 647, 433 A.2d 471
(1988).
The party moving for summary judgment "has the burden of showing the nonexistence of any material fact . . . .";Strada v. Connecticut Newspapers, Inc., 193 Conn. 313, 317,477 A.2d 1005 (1984); and "that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." Batick v. Seymour, supra,186 Conn. 647. The party resisting summary judgment "must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." Scinto v. Stamm, 224 Conn. 524,530, 620 A.2d 109 (1993). Further, summary judgment may be granted on the ground that the statute of limitation has expired; see Varley v. Varley, 181 Conn. 58, 59, 434 A.2d 312
(1980) (trial court granted motion for summary judgment on the ground that the statute of limitation expired); or that the claim or issue has already been litigated, and thus, the doctrines of res judicata and collateral estoppel, respectively, bars further consideration of the matter. Virgo v. Lyons,209 Conn. 497, 501, 551 A.2d 1243 (1988) (indicating that special defenses, such as res judicata and collateral estoppel, are particularly appropriate for summary judgment because it prevents a party from relitigating a claim or issue which has already been determined in a prior judicial action).
On February 28, 1995, all of the defendants, except Bullock, moved for summary judgment as to the counts against them. The relevant counts are 8-14, 16-18, 20, 22-24, 26, 29-30, and 32-35. The court will first address counts 8-14, 16-18, 20, 22-24, 26, 29-30, and 32. Thereafter, the court will address counts 33-35.
A. Counts 8-14, 16-18, 20, 22-24, 26, 29-30, and 32.
The defendants argue that summary judgment should be granted as to Counts 8-14, 16-18, 20, 22-24, 26, 29-30 and 32 because: (1) the applicable statutes of limitations have expired; (2) the claims have already been adjudicated and thus the doctrine of res judicata bars reconsideration; and (3) CT Page 11032 certain issues have already been adversely decided against the plaintiffs and thus the doctrine of collateral estoppel bars relitigation.
The plaintiffs contend that the court should not grant summary judgment on the ground that the statutes of limitations have expired. The plaintiffs argue that the defendants failed to raise the statute of limitations as a special defense and thus the issue is not properly before the court. The plaintiffs also argue that summary judgment should not be granted based upon the doctrine of res judicata because the plaintiffs and defendants here were not the same parties in the previous adjudication. Finally, the plaintiffs argue summary judgment should not be granted based on the doctrine of collateral estoppel because the issues already adjudicated were not central to the prior cause of action and thus not fully and fairly litigated.
On February 15, 1995, the defendants filed an answer to the plaintiffs' amended complaint. Therein the defendants raised as a special defense that the several counts were barred by the applicable statutes of limitation. Thus, contrary to the plaintiffs' argument, the defendants raised the statutes of limitation as a special defense. Accordingly, said defense is properly before the court on a motion for summary judgment.
Counts 8 and 10-14 allege tort causes of action. The applicable statute of limitations is General Statutes § 52-577. Section 52-577 states that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." General Statutes § 52-577. The three year limitation in 52-577 begins to run on the date of the act complained of and not on the date that the plaintiff discovers an injury. See Fichera v. Mine Hill Corp., 207 Conn. 204,212-13, 541 A.2d 472 (1988).
Count 9 alleges negligent infliction of emotional distress. The applicable statute of limitations is General Statutes § 52-584. Section 52-584 states that "[n]o action to recover damages for injury to the person . . . caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of. . . ." CT Page 11033 General Statutes § 52-584. By the express terms of the statute, the outer limits in which a plaintiff may commence an action is three years from the date of the act or omission complained of. Id.
Counts 16-18, 20, 22-24, 26, 29-30 and 32, allege a cause of action based upon the Connecticut Unfair Trade Practices Act ("CUTPA"), codified at General Statutes § 42-110a
et seq. The legislature has expressly stated that "[a]n action under [CUTPA] may not be brought more than three years after the occurrence of a violation of this chapter." See General Statutes § 42-110g(f). The time limitation in which to bring a CUTPA claim begins to run on the date of the act or omission complained of and not when the plaintiff discovers the alleged violation. See Fichera v. Mine Hill Corp., supra 207 Conn. 212-13.
Thus, although different statutory limitations apply to the individual counts, there is a common thread that simplifies the court's approach; the act or omission complained of that is the basis for each cause of action must have occurred within three years from the commencement of the plaintiffs' action. Cf. General Statutes §§ 52-577; 52-584; 42-110g(f).
An action is deemed commenced when the defendant is served with a writ, summons and complaint. See, e.g.,Broderick v. Jackman, 167 Conn. 96, 99, 355 A.2d 234 (1974). The plaintiffs therefore commenced the present action, with respect to all of the defendants except Hushak, Kuhr and Morton, on September 21, 1994, when said defendants were served. Morton, Hushak and Morton were served on September 23, 1994; thus, the plaintiff commenced the action as to these defendants on that date.
In Count 8, the plaintiffs complain that on or about January 1991, the defendants Mann and Morton negligently misrepresented to the plaintiffs that Southington Bank would lend the plaintiffs additional funds if the plaintiffs obtained approval to re-subdivide the 38-1/2 subdivision. Further, in Counts 17 and 23, the plaintiffs allege that this misrepresentation constitutes an unfair trade practice in violation of CUTPA. January 1991 is more than three years prior to the commencement of the plaintiffs' action. Therefore, Counts 8, 17 and 23 are barred by the applicable statute of limitation. See General Statutes §§ 52-577 (applicable to Count 8 alleging fraudulent misrepresentation); 42-110g(f) (applicable to CUTPA CT Page 11034 Counts 17 and 23).
In Count 9, the plaintiffs claim that in September 1990, Mann placed a freeze on their personal saving accounts and certificates of deposit and refused to release the accounts when requested. September 1990 is more than three years prior to the commencement of the plaintiffs' lawsuit. Therefore, Count 9 is barred by the statute of limitation. See General Statutes § 52-584.
In Count 10, Joseph Geladino, Matta and VBD complain that Mann breached a fiduciary duty. Count 10 alleges that on August 23, 1990, Mann took virtual control of VBD as a result of the freeze on the plaintiffs' saving accounts and certificates of deposit. The plaintiffs further allege that Mann created the fiduciary relationship because he controlled the expenditures of the plaintiff's funds on deposit, instructed the plaintiffs to apply for re-subdivision, directed the plaintiffs as to what type of housing to build at the re-subdivision, and sent employees to supervise the progress. Count 10 alleges that the plaintiffs relied on Mann's advice and direction to their financial detriment.
The evidence submitted belies the plaintiffs' claims that Mann exercised control over the plaintiffs. The evidence submitted by both parties discloses that during the trial on the foreclosure actions Joseph Geladino testified that Mann "honored and had faith in me for whatever my ideas were." See Appendix attached to Def's Memorandum of Law, p. A-147. Joseph Geladino testified that he was the expert in real estate development and as such thought that he could make more money if he obtained approval to re-subdivide the property as a cluster zone because he could get more houses into a cluster zone than in the original subdivision. Id. In fact, Joseph Geladino testified that he and Matta decided not to build the house because it was too big and too expensive for the market even though Bullock informed him that Mann wanted "to see a house four to five thousand square foot on one of the better lots in the subdivision." See Def's Memorandum in Support, Exh. 45, pp. 71-73.
Therefore, it is evident from Joseph Geladino's own testimonial admissions that before September 21, 1991, the plaintiffs were aware that Mann was acting in the best interests of Southington Bank and not on the plaintiffs' behalf. CT Page 11035 Accordingly, if any fiduciary relationship existed, Mann breached the relationship before September 1991. Accordingly, because the acts complained of occurred more than three years before the commencement of this action, Count 10 is barred by the applicable statute of limitation. General Statute § 52-577.
In Count 11, the plaintiffs claim that the directors negligently supervised the loaning practices of its employees. All of the lending practices complained of occurred prior to September 1991. Therefore, if the directors negligently supervised the loaning practices of its employees, it occurred prior to September 1991. Accordingly, since the alleged negligent supervision occurred more than three years before the commencement of the plaintiffs' action, Count 11 is barred by the statute of limitations. See General Statutes § 52-577.
In Count 12, the plaintiffs complain that the directors were negligent in that they should have known that Bullock was approving loans for parties with whom he had a personal business relationship. Any loan Bullock approved occurred before his termination in November 1990. It follows that if the directors negligently supervised Bullock, it occurred prior to November 1990. Accordingly, Count 12 is barred by the statute of limitations. General Statutes § 52-577.
In Count 13, the plaintiffs complain that the directors were negligent because: (1) they should have known that Bullock was receiving bribes from customers of the Southington Bank; (2) they permitted Bullock to exceed his lending authority; and, (3) they permitted Mann and Morton in January of 1991 to misrepresent the intentions of Southington Bank. Since each of these acts or omissions complained of occurred more than three years before the commencement of the plaintiffs' lawsuit, Count 13 is barred by the statute of limitations.
In Count 14, the plaintiffs complain that the directors were negligent because they permitted Mann to place a freeze on the plaintiffs' accounts in August 1990. Mann's decision to place the freeze on the plaintiffs' accounts occurred more than three years before the commencement of this lawsuit. Accordingly, Count 14 is barred by the statute of limitations. See General Statutes § 52-577.
In Counts 16 and 22, the plaintiffs complain that Mann's alleged wrongful conduct, as set forth in Counts 8-10, CT Page 11036 constitutes unfair trade practices in violation of CUTPA.[6]
Since the court has already concluded that the acts or omissions complained of by the plaintiffs in Counts 8-10 occurred more than three years before the commencement of this action, it follows that the same alleged acts or omissions cannot form the basis for a CUTPA violation. "An action under [CUTPA] may not be brought more than three years after the occurrence of a violation" of CUTPA. General Statutes § 42-110g(f). Therefore, Counts 16 and 22 are barred by CUTPA's statute of limitation. Id.
In Counts 18, 20, 24, 26, 29, 30 and 32, the plaintiffs complain that the directors' alleged negligent conduct, as set forth in Counts 11-13, constitute unfair trade practices in violation of CUTPA.[7] Again, since the court has already concluded that the acts or omissions complained of by the plaintiffs in Counts 11-13 occurred more than three years before the commencement of this action, it follows that the same alleged acts or omissions cannot form the basis for a CUTPA violation. "An action under [CUTPA] may not be brought more than three years after the occurrence of a violation" of CUTPA. General Statutes § 42-110g(f). Therefore, Counts 18, 20, 24, 26, 29, 30 and 32 are barred by CUTPA's statute of limitation. Id.
B. Counts 33-35
In Count 33, the plaintiffs allege that "[o]n several occasions during the month of July 1994 the Plaintiffs, Joseph Geladino and Ann Marie Geladino Matta, and representatives of Southington Savings Bank met to discuss the possibility of settling their respective claims against each other." See Amended Compl. ¶ 154. The plaintiffs further allege that "[d]uring discussions representatives of Southington Savings Bank represented to the Plaintiffs that the Bank would consider releasing the mortgage lien on certain properties to the Plaintiffs if the Plaintiffs in return would relinquish their title to certain other properties to the Bank." See id., ¶ 155. The plaintiffs allege that the defendants in fact never intended to release the mortgage liens on the properties. The plaintiffs allege that they relied on these intentional misrepresentations, continued to negotiate in good faith, and allowed their various claims against the defendants to lie dormant. The plaintiffs allege that the defendants' intentional misrepresentations were immoral and unscrupulous, and thus, constitute a violation of CUTPA. CT Page 11037
The defendants argue that summary judgment should be granted as to Count 33 for several reasons. First, the defendants argue that even assuming that the defendants engaged in bad faith negotiations, the plaintiffs could not have relied upon them to let their claims lie dormant because the claims were already dismissed in June 1994. In support, the defendants assert that the 1993 action was placed on the dormancy list in April 1994. Further, the defendants contend that the 1993 action was dismissed for lack of prosecution in June 1994. Thus, the defendants argue that reliance on July 1994 negotiations could not have caused the dismissal of an action already dismissed in June 1994.
The defendants further argue that if the plaintiffs relied upon the negotiations to the detriment of their claims, they did so at their own peril. The defendants contend that before initiating any settlement negotiations, both parties agreed to conditions. The defendants contend that both the plaintiffs and defendants agreed that the negotiations would not prejudice the parties' rights to prosecute any outstanding claims. Thus, the defendants argue that if the plaintiffs did in fact allow their claims to lie dormant in reliance upon settlement negotiations, they did so of their own accord and in direct violation of the terms and conditions governing the settlement negotiations.
The plaintiffs' argument is devoid of any analysis and therein they simply claim that it is not attempting to introduce into evidence the substance of the negotiations, but only the unscrupulous manner in which Southington Bank negotiated. It is clear from the evidence that the plaintiffs 1993 action was placed on the dormancy list in April 1994, and dismissed for want of prosecution in June 1994. Therefore, contrary to the plaintiffs' allegations, there could be no reliance upon the negotiations even if conducted in bad faith.
Furthermore, during oral argument on the plaintiffs' motion to reopen the dismissal of the 1993 action, the plaintiffs failed to suggest that the reason that they failed to prosecute the action was because they relied upon certain settlement negotiations. It is clear from the evidence that the plaintiffs' claim was dismissed prior to the July 1994 settlement negotiations. Accordingly, the court finds that there is no genuine issue of fact that the plaintiffs failed to rely CT Page 11038 upon the defendants' alleged bad faith negotiations as alleged.
In Count 34 and 35, the plaintiffs allege that the defendants caused the dismissal of the plaintiffs' foreclosure appeal in violation of the automatic stay provision of11 U.S.C. § 362(a). The plaintiffs further claim that said conduct constitutes a violation of CUTPA. The defendants move for summary judgment arguing that there remains no genuine issue that the defendants did not procure or cause the dismissal of the plaintiff's appeal.
The affidavit of Paul Hartan, Assistant Clerk for the Appellate Court, is dispositive of this issue. In the affidavit, Hartan states: "I am the case manager responsible for the appeal known as Southington Savings Bank v. Village Builders Developers, Inc., Appeal No. 12851. . . . On July 19, 1994, and on or about 12:33 p. m., I received a telephone call from Attorney Christopher J. Hug informing me that relief from stay in the Toffolon bankruptcy case had been obtained. In that telephone conversation, I requested that Attorney Hug send me a copy of the order granting relief from stay in the Toffolon bankruptcy case, which order I received later that day. At no time, either during the above-referenced telephone conversation, or on July 20 or 21, 1994, did I receive a request, either orally or in writing, from Robinson Cole or any of its attorneys requesting that I dismiss the appeal." See Def's Memorandum in Support, Exh. 31, ¶¶ 3, 6-7.
The Appellate Courts order dismissing the plaintiffs appeal is signed by Hartan. Thus, Hartan has first hand knowledge of the events leading up to the dismissal of the plaintiffs' appeal. Hartan expressly contradicts the plaintiffs' allegation that the defendants procured the dismissal of the appeal. Although the date stamp on the Appellate Court's copy of the Bankruptcy Court's order granting relief from the automatic stay indicates that the Appellate Court received the copy on July 20, 1994, at 12:34 p. m., Hartan has expressly stated that the defendants did not request the dismissal of the appeal. Accordingly, the court finds that the evidence establishes that the defendants did not procure the dismissal of the plaintiffs' foreclosure appeal.
III. CONCLUSION
The court finds that the acts or omissions complained CT Page 11039 of in Counts 8-14, 16-18, 20, 22-24, 26, 29-30, and 32, occurred more than three years before the commencement of the plaintiffs' action. Accordingly, summary judgment is granted in favor of the defendants as to these counts because each cause of action is barred by the applicable statute of limitation.
The court further finds that, the plaintiffs' alleged reliance upon the July 1994 negotiations could not have caused the plaintiffs to let their claims against the defendants to lie dormant. The plaintiffs' claims were dismissed in June 1994. Accordingly, summary judgment is also granted in favor of the defendants as to Count 33.
Finally, the court finds that the evidence submitted establishes that the defendants did not procure the dismissal of the plaintiff's appeal in violation of 11 U.S.C. § 362(a). Accordingly, summary judgment is granted as to Counts 34 and 35.
ROBERT F. STENGEL JUDGE, SUPERIOR COURT