[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT
Defendant The May Department Stores Company ("Lord Taylor" and "Filene's") has filed a Motion for Summary Judgment on Plaintiffs Amanda CT Page 3350 Mytych and Veretta Michaud's Third Amended Complaint.
Statement of Facts
The following facts are not disputed. The plaintiffs are or were sales employees selling shoes at various retail stores owned by May Department Stores. In Connecticut, May operates department stores under the trade names of Lord Taylor and Filene's.
In October 1995, Mytych accepted Lord Taylor's offer of employment as a part-time commissioned salesperson in the women's shoe department at its West Farms store. At the time she accepted the offer, Lord Taylor told her that she would receive an 8% commission on her net sales, provided her with a copy of Lord Taylor's Women's Shoes Associate Commission Agreement, and asked her to sign an acknowledgment that she had read and understood the agreement. Under the Women's Shoes Associate Commission Agreement, Mytych agreed that Lord Taylor would pay her "a straight commission on net sales." "Net sales" was defined, in pertinent part, as her gross sales
 • less any applicable customer/employee discount,
 • less any identified returns ("assigned credits") — the retail price of merchandise which a customer has returned with a sales receipt — and,
 • less any unidentified returns ("unassigned credits") — her pro rata share of the retail price of merchandise which a customer has returned without a sales receipt and hence without any means of identifying the salesperson who initially made the sale.
She further agreed that Lord Taylor would calculate her pro rata share of the "unidentified returns" as a percent of each commissioned salesperson's sales in her department:
 FOR EXAMPLE: If you sell 10% of all merchandise in a given week, then 10% of the unassigned credits ([unidentified] returns) will be charged against your sales for that week.
Lord Taylor paid Mytych her all of her earned commissions as agreed and that Lord Taylor regularly provided her with a Sales/Returns CT Page 3351 Commission Report with her paychecks. The Reports set forth Lord 
Taylor's calculation of her earned commissions so that she could verify the accuracy of the calculation.
In February 2000. Mytych voluntarily left Lord Taylor and accepted Filene's offer of part-time employment as a commissioned salesperson in the women's shoe department at its West Farms store. She applied for a commissioned salesperson's position because she could "make more money' than an hourly salesperson and wanted to work at the Filene's women's shoe department because it was busier than Lord Taylor's women's shoe department. At the time she accepted Filene's offer, she had a basic understanding of how her commissions would be calculated and understood that she would be paid a 9% commission on her "net sales," as defined above.
With each paycheck, Filene's provided Mytych with a Commission Payment Summary and a Sales/Returns Commission Report which set forth Filene's calculation of her commission earnings for that pay period. As at Lord 
Taylor, Mytych received a commission based on her gross sales less identified returns, unidentified returns, and customer/employee discounts.
Between 1992 and 1995, Michaud worked as an hourly salesperson in various departments at Lord Taylor's Trumbull store. In May 1995, Michaud applied for and obtained a full-time commissioned sales position in the women's shoe department. She applied for the position because she could make more money as a commissioned, rather than an hourly, salesperson.
At the time she accepted Lord Taylor's offer to work in the women's shoe department, Michaud agreed that Lord Taylor would pay her a 9 1/2% commission on her net sales. Lord Taylor provided her with a copy of the Lord Taylor Women's Shoes Commission Agreement — the same agreement provided to Mytych — which, in Michaud's words, was "self-explanatory" and set forth, in "black and white," her agreement on how Lord Taylor would pay her. Like Mytych, Michaud signed an acknowledgment indicating that she had read and understood the agreement.
In successive years of her employment in the women's shoe department, she signed similar commission agreements.
Lord Taylor regularly provided Michaud with a Sales/Returns Commission Report with her paychecks which set forth her gross sales less identified returns, unidentified returns, and customer/employee discounts. The Reports explained Lord Taylor's calculation of her earned commissions. Lord Taylor paid Michaud all of her earned commissions as agreed. CT Page 3352
Lord Taylor and Filene's formulated their commission policies in response to the prevailing industry practice. Virtually all of Lord 
Taylor's and Filene's competitors have similar policies.
Position of the Parties
Although the plaintiffs allege at various times that the defendant illegally deducted from the "commissions," they are actually challenging the manner in which the defendant deducted from the plaintiffs' gross sales to calculate those commissions. The plaintiffs do not challenge the defendant's deduction of identified returns from an employee's gross sales. They acknowledge that when a salesperson sells a pair of shoes and the buyer returns those shoes, the salesperson is not entitled to a commission on that sale. See Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, p. 11.
The gravamen of the plaintiffs' claim is that in deducting an employee's pro rata share of unidentified returns from their gross sales 1) the defendant is unfairly diminishing the plaintiffs' commissions, 2) that the deduction of unidentified returns bears no reasonable relationship to the plaintiffs' job performance and 3) that the deduction constitutes the defendant's improper attempt to force the plaintiffs to bear its cost of doing business. The plaintiffs have not presented any evidence to support the foregoing integral elements of their claim.
The defendant has presented evidence that it formulated its policy of allocating unidentified returns such that it would have a reasonable relationship to the job performance of the plaintiffs: Deducting from a salesperson's gross sales his or her pro rata share of unidentified returns based on that salesperson's quantum of sales in the previous week is statistically designed to increase the likelihood that an affected salesperson actually "sold that [returned] shoe and received that commission in the first place." Because the defendant's no receipt return policy is designed to create customer good will and generate repeat business, a commissioned salesperson can — as even Mytych admits — make more money by generating still more sales with their customers.
Discussion of Law and Ruling
Practice Book § 17-49 (formerly § 384) provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Connecticut Bank Trust Co. v. Carriage Lane Associates,
CT Page 3353219 Conn. 772, 780-81, 595 A.2d 334 (1991); Lees v. Middlesex Ins. Co.,219 Conn. 644, 650, 594 A.2d 952 (1991). Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434,429 A.2d 908 (1980); a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact, together with the evidence disclosing the existence of such an issue. Practice Book §§ 17-45, 17-46; Burns v. Hartford Hospital,192 Conn. 451, 455, 472 A.2d 1257 (1984). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. Town Bank Trust Co. v. Benson,176 Conn. 304, 309, 407 A.2d 971 (1978); Strada v. ConnecticutNewspapers, Inc., 193 Conn. 313, 317, 477 A.2d 1005 (1984). The test is whether a party would be entitled to a directed verdict on the same facts. Batick v. Seymour, 186 Conn. 632, 647, 443 A.2d 471 (1982); NewMilford Savings Bank v. Roina, 38 Conn. App. 240; 243-44, 659 A.2d 1226
(1995).
Summary judgment should only be granted if the pleadings, affidavits and other proof submitted demonstrate that there is no genuine issue as to any material fact. Scinto v. Stam, 224 Conn. 524, 530, cert. denied,114 S.Ct. 176, 126 L.Ed.2d 136 (1993); Connell v. Colwell, 214 Conn. 242,246, 571 A.2d 116 (1991). Summary judgment is "designed to eliminate the delay and expense of litigating an issue where there is no real issue to be tried." Wilson v. City of New Haven, 213 Conn. 277, 279, 567 A.2d 829
(1989)
Although Mytych and Michaud admit that Lord Taylor and Filene's paid their agreed upon wages in full, they contend that Lord Taylor's and Filene's practices with respect to unidentified returns constitute an illegal deduction from, or an illegal refund of, their wages in violation of §§ 31-71 (e) and 31-73 of the Connecticut General Statutes. These statutes, however, are designed to protect the sanctity of the wage agreement and to provide an employee an enhanced remedy in the event an employer reneges on its promise to pay a wage as agreed.
Construction of these statutes requires a "reasoned search for the intention of the legislature." Frillici v. Town of Westport, 231 Conn. 418,431, 650 A.2d 557 (1994). Toward that end, the court looks to "the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." Butler ex rel.Skidmore v. Hartford Technical Inst., 243 Conn. 454, 463, 704 A.2d 222
(1997). CT Page 3354
Connecticut General Statutes § 31-71 (e) provides:
 No employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer and recorded in the employer's record book.
(emphasis supplied).
Under the plain meaning of the statute, once an agreed upon wage has fully vested, the employer cannot seek to take back any portion of the wage he has agreed to pay. "Wages," as used in §§ 31-71 (e) and 31-73
(e), "means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." § 31-71 (a)
As the broad definition of "wages" suggests, the statute does not purport to prescribe how that wage is to be calculated or determined. The definition itself does not purport to prescribe what is or is not a proper wage but broadly includes any "wage" — no matter how calculated — which an employer has promised to pay an employee and for which that employee's previous performance of labor and services now entitles him or her to receive as a matter of right.
Moreover, as explained in Roto-Rooter Services Co. v. Department ofLabor, 219 Conn. 520, 527-28, 593 A.2d 1386 (1991), the definition of "commissions, "as used in the Connecticut wage payment statutes, is found "in [the] regulations of the labor commissioner." Under these regulations, "commissions" is broadly defined to include virtually any "working agreement" between an employer and an employee. In one such regulation,
 . . . "Commissions" means any premium or incentive compensation for business transacted whether based on per centum of total valuation or specific rate per unit of accomplishment. "Incentive plan" means any method of compensation, including, without limitation thereto, commissions, piece rate, bonuses, etc. based upon the amount of the results produced, by which the employee becomes entitled to the compensation upon the CT Page 3355 fulfillment of the conditions established as part of the working agreement. . . .
Regs. Conn. State Agencies § 31-60-1 (emphasis supplied). In another such regulation,
 . . . "Commissions" means earnings based on sales. These earnings may be achieved through the payment of a fixed sum per sale or by the payment of a percentage on any or all sales made by an individual or group of individuals.
Regs. Conn. State Agencies § 31-62-D1 (emphasis supplied).
Consistent with the definition of "wages," these definitions of "commissions" do not prescribe the gamut of permissible commission arrangements. They simply leave that determination to the employer and employee's "working agreement." Mytych's and Michaud's wage agreements are "working agreements"within the meaning of these regulations and their earnings, as reflected by these agreements, are based on a percent of "any or all" sales made by "an individual or group of individuals."
Given these definitions of "wages" and "commissions," it is clear that § 31-71 (e) is designed to ensure the full payment of agreed upon wages which have vested and accrued.
Under their "working agreements," Mytych and Michaud understood and agreed that their earnings — or vested wages — would be determined as a percent of their net sales. Accordingly, since their right to a particular wage did not vest until Lord Taylor and Filene's had applied the preapproved formula for the calculation of their earned commissions and had subtracted from their gross sales their pro rata share of unidentified returns, under the statute, Lord Taylor and Filene's did not attempt to deduct any sums from their wages.
Connecticut General Statutes § 31-73 provides, in pertinent part:
 No employer . . . shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of wages agreed to be paid, upon the representation or understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment.
Section 31-73 (a) defines "refund of wages" as: CT Page 3356
 (1) The return by an employee to his employer . . . any sum of money actually paid or owed to an employee in return for services performed, or
 (2) payment by the employer . . . to an employee of wages at a rate less than that agreed to by the employee.
Emphasis added.
The purpose of § 31-73 is to protect the sanctity of the wage agreement and to provide an employee an enhanced remedy for the collection of wages. Section 31-73, like § 31-71 (e), does not purport to prescribe how that wage is to be determined or calculated.
Mytych and Michaud have admitted that the defendant has paid them all "wages" which Lord Taylor and Filene's "agreed [would] be paid." Lord 
Taylor and Filene's did not pay them "wages at a rate less than agreed to" and did not ask them to return "any sum of money actually paid or owed."
The statutory scheme embodied in these wage payment statutes reflects an intent to protect the sanctity of the wage agreement and to provide an employee an enhanced remedy if an employer reneges on his promise to pay an agreed upon wage. It does not embody substantive provisions on how to determine those wages.
In Shortt v. New Medford Police Dept., 212 Conn. 294, 562 A.2d 7
(1989), for example, the Connecticut Supreme Court examined the statutory scheme and its legislative history and concluded:
 Our statute, by contrast with [the Fair Labor Standards Act], merely provides an enhanced remedy for the collection of wages. It does not embody substantive standards to determine the amount of wages that are payable but provides penalties in order to deter employers from deferring wage payments once they have accrued. Section 31-72 [which provides litigants a private cause of action under § 31-71] is, therefore, a remedial statute rather than one creating independent substantive rights.
212 Conn. at 308-09 (emphasis added). In enacting these laws the Legislature intended them to provide a remedy only for "the collection of wages" once the right to those wages have accrued. It did not intend for CT Page 3357 them to set forth "substantive standards" on how those wages should be calculated and thus did not create "independent substantive rights."
The other courts which have addressed the purpose behind the statutory scheme have concurred in the Shortt Court's conclusion. See, e.g., Butlerv. Hartford Technical Inst., 243 Conn. 454, 463, 704 A.2d 222 (1997) ("[o]ur legislature . . . recognized the important public policy of ensuring that employees receive wages due them"; the wage payment statute "`provides penalties in order to deter employers from deferring wagepayments once they have accrued'" (emphasis added)); State of Connecticutv. Merdinger, 37 Conn. App. 379, 383, 655 A.2d 1167 (1995) ("the legislative history of the statute reveals that it was intended to assurethe orderly payment of wages" (emphasis added)); Swihart v. Country HomeBakers, 1999 WL 545385 at 3 (Super.Ct. 1999) (the wage payment statutes "create a direct independent statutory right to sue for the employee deprived of earned or accrued benefits" (emphasis added)); ABC OfficeEquipment, Inc. v. Royal Consumer Business Products, 721 F. Sup. 1557,1559 (D.Conn. 1989) ("the statute . . . is concerned with the timelypayment of wages and was enacted to discourage the unilateral withholding of wages by an employer" (emphasis added)).
The legislative history to these statutes, albeit scant, is consistent with such a conclusion. In her successful support of an amendment to the wage statutes, providing employees with enhanced remedies in the event an employer fails to pay their vested and accrued wages, Nancy Johnson, the amendment's sponsor, noted:
 The payment of earned wages is a gut-level right that should be assured by clear, strong state statutes. . . . The weaknesses of these statutes came to my attention through the experience of a constituent whose wage checked bounced. . . . A person must be able to count on his or her paycheck — that it will be forthcoming . . . and that[,] if paid by check, that the check will not bounce. . . .
Conn. Joint Standing Committee Hearings, Labor 1978 Sess. Sections 31-71
and 31-73 contain nothing prescribing how earned wages should be calculated.
The Attorneys General who have been called upon to construe these statutes have not found them to contain provisions dictating the manner in which wages or commissions should be calculated. Attny. Gen. Opin., 1976 WL 29975 (April 28, 1976) (§ 31-73's "entire thrust . . . is to prevent a "kickback' system from being used to exact a payment from an CT Page 3358 employee to an employer in return for that employee's hiring . . ."); Attny. Gen. Opin. (July 11, 1957 ("[t]he purpose of our statutes prohibiting deductions from the wages earned by an employee is to prevent an arbitrary determination by the employer of deductions of wages due an employee"; emphasis supplied).
The courts which have applied these statutes have consistently found that they are limited in scope to the collection of vested and accrued wages and have refused to find that these statutes create any substantive rights as to a particular amount of wages or to a particular formula for the calculation of those wages. As one court put it, "the court will not create a contract not agreed to or contemplated by the parties"; to recover, an employee must "prove his entitlement to the amount claimed under the employment contract relied upon." Turecek v. A-Lined HandlingSystems, Inc., 1990 WL 272174 at 2, 3 (Super.Ct. 1990).
In Christensen v. BIC Corp., 18 Conn. App. 451, 458, 558 A.2d 273
(1989), the plaintiff alleged that his unpaid bonus constituted wages under § 31-71a. The Court overturned a verdict in favor of the plaintiff, holding an employee could not recover under the wage statutes because he failed to show his entitlement to the wages under his wage agreement. See also Electric Boat Corp. v. Cooke, 1999 WL 259835 (Super. Ct. 1999) (an employer's withholding of a hypothetical tax deduction from an employee which was standard practice in the industry did not violate the wage statutes because the employee agreed to the deduction in his wage agreement); Corcoran v. F. W. Welding Service, Inc., 1998 WL 13873 (Super.Ct. 1998) (employer's refusal to pay employee additional commissions did not violate the wage statutes because the employer "set the rules as to whom and when commissions were due" and had already paid him all commissions due); Petronella v. Combined Ins. Co. of America, 1997 WL 644884 (Super.Ct. 1997) (employer's refusal to pay an employee a commission did not violate the wage statutes because she failed to show her entitlement to the commission under her commission agreement and the standard practices of her employer); Okron v. Medical Marketing Group,Inc., 12 Conn.L.Rptr. 228 (1994) (employee's wage claim was not actionable under the wage payment statutes because his wages had not "vested" under the terms of his employment agreement).
"Courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation." Burnham v.Karl Gelb, P. C., 252 Conn. 153, 165, 745 A.2d 178 (2000). As Judge Corradino explained in Swihart v. Country Home Bakers, Inc., 1998 WL 867327 (Super.Ct. 1998), courts should be especially careful when asked to engraft upon the employment relationship rights which are nowhere granted in the parties' employment agreement. As he put it, courts should generally refrain from disturbing "the requirements of predictability CT Page 3359 which are crucial in labor-management relations as in all areas of economic activity where companies and workers have to be able to make plans for their future activity." Swihart, 1998 WL 867327 at 3. Indeed, the courts should "tread very delicately in this area" lest a seemingly fair result for a particular employee inadvertently causes harm to all other employees. Id.
The plaintiffs seek to evade the effect of the foregoing statutes, regulations and case law which establish that commissions are determined based on an agreement between the employer and the employee by arguing that an agreement to do something illegal is void and against public policy. The bases of the plaintiffs' claims of illegality are 1) the defendants have forced the plaintiffs to refund a portion of their commissions in violation of § 31-71e; and 2) the defendant's formula for calculating commissions harms the plaintiffs while helping the defendant.
The plaintiffs' first claim of illegality is based on a misreading of the commission agreements between the plaintiffs and the defendant. Those agreements do not provide that unidentified returns will be deducted from the plaintiffs' already earned commissions. Rather, they provide that the commissions are calculated based on a percentage of net sales, which include the employee's gross sales minus identified and unidentified returns.
The plaintiffs have attempted to underscore this first claim of illegality by proffering the opinion of the assistant director of the Connecticut Department of Labor. However, that opinion is based on the assumption that the defendant deducts from previously earned commissions. As stated above, there is no evidence to support that assumption.
The plaintiffs have provided no evidence that any plaintiff has been harmed by the defendant's deduction for unidentified returns in the calculation of net sales. The plaintiffs have simply assumed that such a deduction is harmful. In support of that assumption they have cited the following language from Hudgins v. Neiman Marcus Group, 34 Cal.App. 4th
1109 (Cal.App. 1 Dist 1995):
 [T]o the extent the employer deducts for unidentified returns resulting from other employees . . . the conscientious sales associate is required to return a portion of commissions he or she has legitimately earned from completed sales in order to compensate Neiman Marcus for commissions paid on sales other employees did not complete — amounts that would CT Page 3360 otherwise be a business loss the conscientious sales associate has done nothing to cause. This policy of punishing all employees for the sins of a few cannot survive scrutiny under California law.
The plaintiffs in this case have submitted no evidence that they are conscientious. Assuming that the plaintiffs and the class they purport to represent are all conscientious workers, they have also failed to present any evidence that such conscientiousness helps prevent their customers from returning shoes without a receipt.
The plaintiffs concede that they are not entitled to a commission if one of their customers returns shoes with a receipt because the sale they made is effectively unmade by the return. However, they assume without any evidence whatsoever that the returns made without a receipt are done by some other salesperson's customers and, thus, that they are necessarily harmed by the defendant's deduction of unidentified returns to determine their net sales for the purpose of calculating their commission. Based on the evidence submitted by the defendant it appears just as likely that the plaintiffs would be helped by the deduction of unidentified returns. For example, if Mytych sold ten pairs of shoes in a week, and those sales represented 20% of the shoe sales for the department, and all ten customers returned their shoes with receipts,
then Mytych would have no net sales for the week and would receive no commission. However, if all of Mytych's customers returned their shoes without receipts, then she would only be charged for 20% of the returns because she made 20% of the sales. Therefore, she would receive commissions on 80% of the shoes she had sold for the week.
The defendant's commission calculation formula — by deducting from a salesperson's gross sales his or her pro rata share of unidentified returns based on that salesperson's quantum of sales in the previous week — is statistically designed to increase the likelihood that an affected salesperson actually "sold that [returned] shoe and received that commission in the first place." (Logan Depo., 15:11-16:1) In absence of any evidence to the contrary it is logical to assume, as the formula does, that all salespersons sell to customers who return goods without receipt at approximately the same rate.
The plaintiffs have also argued that the defendant's method of calculating commissions is an attempt to penalize the plaintiff employees for their employer's cost of doing business. However, again, the plaintiffs have argued as if this were a Motion to Strike. A party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact, together with theevidence disclosing the existence of such an issue. Practice Book §§ CT Page 3361 17-45, 17-46; Burns v. Hartford Hospital, 192 Conn. 451, 455,472 A.2d 1257 (1984). The plaintiffs have not produced any evidence that the plaintiffs are harmed or that the defendant is helped by the manner in which the plaintiffs' commissions are calculated.
The plaintiffs have relied on the case of Hudgins v. Neiman MarcusGroup, Inc., 34 Cal.App. 4th 1109 (Cal.App. 1995) in support of their claim. However, another out-of-state decision supports the claim of the defendant. In Oja v. Dayton Hudson, 458 N.W.2d 169 (Minn.App. 1990), a Dayton Hudson commissioned salesperson contended that Dayton Hudson's calculation of her commissions — a percent of her net sales which Dayton Hudson calculated by, among other things, deducting her proportionate share of unidentified returns from her gross sales — violated Minnesota's wage payment statutes. After noting that Minnesota's wage payment statutes prohibited an employer from making any "deduction . . . from the wages due and earned by" an employee, the Court of Appeals held that Dayton Hudson's commission policy did not violate Minnesota law:
 Here, Oja has been promised a 9% commission on her net sales. For each commission period, net sales are determined by subtracting identified returns and unidentified returns from gross sales. Returns do not result in repayment of past commissions, but merely reduce net sales for the period in which they occur. Oja is thus paid a commission on her net sales for a particular period of time; she is not entitled to a commission on the gross sales price of each pair of shoes she sells as soon as she makes the sale. Because her commission or compensation is not "due or earned" until certain amounts for returned merchandise have been subtracted from her gross sales Dayton's policy does not violate Minn. Stat. § 181.79.
Oja, 458 N.W.2d at 770.
Since Connecticut's wage payment statutes, like Minnesota's statute, prohibit deductions only from accrued and vested wages (that is, wages which are "due and earned"), the Minnesota Court of Appeals' decision supports the defendant's position here.
By contrast, in Hudgins, the California Court of Appeal held that Neiman Marcus' commission policy which "deduct[ed] the amounts previouslypaid for "unidentified returns' on a pro rata basis from the wages of their commissioned sales associates" violated California's own wage payment statute which prohibits an employer from "collect[ing] or CT Page 3362 receiv[ing] any part of wages theretofore paid." Hudgins, 34 Cal.App. 4th
at 1111, 1117 (emphasis supplied). Apart from the fact that Neiman Marcus made deductions for unidentified returns from its employee's previously paid wages, the Court of Appeal rested its decision on a long line of California regulatory opinions and case law which held that an employee's right to a commission does in fact vest at the time of sale. Hudgins,34 Cal.App. 4th at 1129, n. 9. It was primarily for this reason that the California Court of Appeals rejected the Minnesota Court of Appeals decision in Oja. Hudgins, 34 Cal.App. 4th at 1121 ("the rationale employed by the Minnesota Court of Appeals to determine when and how a commission has been "earned' has been expressly rejected in California").
Neither Connecticut wage payment statutes nor the Labor Commissioner's definition of "commissions" prescribe when a commission is earned but, instead, expressly leave that determination to the parties' agreement. See, e.g., Regs. Conn. State Agencies § 31-60-1 (recognizing that a commission is earned only upon the "fulfillment of the conditions" established in the employer/employee's "working agreement").
Apparently in light of the foregoing statutes and regulations which allow an employer and employee to agree on the manner in which their commission is calculated Mytych and Michaud contend that they are not "bound" by the commission agreements they signed because of the disclaimer language set forth in those agreements. Specifically, they contend that Lord Taylor's disclaimer language, which states that the agreement "does not create an employment contract . . . between Lord 
Taylor and its Associates," renders these agreements unenforceable.
In Connecticut, as in many other jurisdictions, a policy statement or employee manual may create "a contract of employment which limit[s] the employer's right to discharge an otherwise at-will employee." Finley v.Aetna Life Cas. Co., 5 Conn. App. 394, 406, 499 A.2d 64 (1985), rev'd onother grounds, 202 Conn. 190, 520 A.2d 808 (1987). As the Finley Court recognized, however, the issue of whether a manual or policy statement may be read as a contract or promise of continued employment is entirely distinct from an employee's right to compensation or benefits for labor or services performed. In these situations, there is a binding contract to pay as agreed "even where the writing specifically claimed the benefits to be . . . not contractual." Finley, 5 Conn. App. at 407. As the Connecticut Supreme Court stated:
 [W]e note that all employer-employee relationships not governed by express contracts involve some type of implied "contract" of employment. "There cannot be any serious dispute that there is a bargain of some kind; CT Page 3363 otherwise the employee would not be working."
Toroysan v. Boeringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 13,662 A.2d 89 (1995) (citations omitted). Regardless of any disclaimers in the written policy, and regardless of whether there is any writing at all, the promise of compensation "constitutes a contract between the employer and employee, supported by the consideration of the employee's subsequent continued employment." Finley, 5 Conn. App. at 407. Lord 
Taylor and Filene's commission agreements certainly do define the agreed method and rate of pay without constituting a contract of employment which alters their status as employees at will.
The plaintiffs have failed to demonstrate the existence of any material fact or establish any principle of law which might preclude this Court from entering summary judgment favor of the defendant. Sections 31-71 (e) and 31-73 do not create a right to any particular amount of wages or create any particular formula for the calculation of those wages. Rather, in recognition of the sanctity of the wage agreement, they provide a remedy for the collection of wages which have fully accrued and vested. In their wage agreements with Lord Taylor and Filene's, Mytych and Michaud agreed that they would be paid a commission based on a formula. As they admit, Lord Taylor and Filene's paid them their commissions on the basis of that formula and thus paid them for all their accrued and vested wages.
For the reasons set forth above, summary judgment may enter in favor of the defendant.
By the court,
Aurigemma, J.