[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT BY FUSS O'NEILL, INC.
The defendant Fuss O'Neill, Inc. ("Fuss O'Neill") has moved for summary judgment against the plaintiffs, Somers Mill Associates, Inc., John Ahern, Frank Perroti, Jr., Lawrence P. Brophy, ("Brophy") and Thomas Santa Barbara, Jr. ("plaintiffs"), on grounds that no genuine issue of material fact exists as to liability, and that Fuss O'Neill is entitled to judgment as a matter of law because: (1) Plaintiffs cannot prove that Fuss O'Neill was negligent in the absence of any expert testimony that Fuss O'Neill breached the standard of care; (2) plaintiffs cannot prove that the claimed damages were proximately caused by Fuss O'Neill; (3) plaintiffs' claim is barred by the expiration of the statute of limitations, as set forth in Fuss O'Neill's special defense; (4) plaintiffs' claim is barred by the economic loss doctrine; (5) Plaintiffs sustained no damages because plaintiffs did not abandon the pre-existing commercial/industrial use of the building; and (6) Plaintiffs' claim must be dismissed for failing to exhaust available administrative remedies.
STATEMENT OF FACTS
 Plaintiffs' Allegations against Fuss O'Neill
The plaintiffs have asserted one count of professional malpractice against Fuss O'Neill, based on an allegation of negligent misrepresentation. Plaintiffs allege in their Amended Revised Complaint, dated July 28, 1997, that they hired Fuss O'Neill to perform engineering services "intended to assist in the determining the feasibility of renovating [the] Somers Mill for residential purposes." The plaintiffs allege that one of the services "was to determine whether any floor of the building on which residential development was contemplated was or was not within the 100 year flood plain, as any portion of the building which was within the 100 year flood plain could not be developed for residential purposes." The Complaint further alleges that Fuss O'Neill performed the above described service and that it represented to Plaintiffs that no floor of the building above the basement was within the 100 year flood plain and that this was false and constituted a misrepresentation, and that plaintiffs "reasonably relied CT Page 2118 on the representations of Fuss O'Neill concerning the location of the building in relation to the 100 year flood plain in proceeding with plans for residential development of the property." Finally, the plaintiffs allege that as the result of the Federal Emergency Management Agency's (FEMA's) change of the Flood Insurance Rate Map (FIRM) in 1995 to depict a higher flood elevation in the vicinity of the Mill, the Mill could no longer be developed. They then claim that as the result of Fuss 
O'Neill's negligence, their investment in the Mill is lost.
In its Amended Answer, dated April 6, 2001, Fuss O'Neill denied the plaintiffs' allegations and asserted several special defenses, including the expiration of the statute of limitations.
Facts Relevant to Summary Judgment
The defendants have presented evidence to establish the following facts. In December 22, 1988, plaintiff Somers Mill Associates, Inc. purchased the Somers Mill property located in the Town of Somers. Plaintiffs have testified that they were considering different options for development, including converting the building for residential use or maintaining the building as commercial and industrial.
At the time of the purchase, the Somers Mill property was zoned for commercial and industrial use and was being occupied by commercial and industrial tenants. Brophy knew that the property would have to be rezoned in order to allow for residential uses. Also, at that time, the FIRM for the area of the building immediately adjacent to the Somers Mill Property indicated a "100-year flood" plain elevation of 180 feet
National Geodetic Vertical Datum ("NGVD").
Even though Brophy admitted that he knew before he purchased the property that there would be an issue with respect to the 100-year flood plain and residential development he did not investigate the feasibility of residential use of the property or conduct any site studies to determine the location of the Mill's floors in relation to the base flood elevation before the purchase.
After the purchase, Brophy immediately began to direct substantial repairs to the Mill building. Mr. Brophy testified that these repairs would have been needed regardless of his anticipated use of the building. Brophy also evicted existing commercial and industrial tenants who were still occupying the building, without knowing whether they were going to maintain the building for commercial and industrial use or convert the Mill for residential use.
In April of 1989, Brophy approached Fuss O'Neill, a Connecticut CT Page 2119 engineering firm, to work on the project. Brophy testified that Fuss 
O'Neill was hired to "do a site analysis and evaluate the possibility of converting the building into residences." Fuss O'Neill performed some preliminary survey work for plaintiffs, with the ultimate goal of drafting a site plan for approval by the Town. Sometime in the late Summer, early Fall of 1989, the plaintiffs decided to end their relationship with Fuss O'Neill on all projects, including the Somers Mill project. Mr. Brophy testified that he became dissatisfied with Fuss O'Neill's work on a project at 91 Elm Street in Manchester, because the calculations used by Fuss O'Neill for certain elevations were incorrect. Fuss O'Neill was never paid anything for its work on the Somers Mill project.
Fuss O'Neill's work on the project ended October 2, 1989, with the majority of the work having taken place in July, 1989. Fuss O'Neill's time sheets show survey work of the Mill, services in connection with wetlands-related issues, and gathering of materials for later design work. Fuss O'Neill did not complete a boundary or topographic survey before it was fired, did not issue any documents to the plaintiffs, and did not generate any signed, stamped or certified plans for the plaintiffs, review or for submission to the Town of Somers. Mr. Brophy claims that shortly before he ended all relations with Fuss O'Neill, Fuss O'Neill employee Dick Boston told him, in the course of a meeting at the 91 Elm Street, Manchester project that the first floor of the Somers Mill building was located at an elevation of approximately 182 feet, and that the 100-year flood level at the face of the building was approximately 180 feet, and that therefore the first floor was above the 100 year flood elevation and usable for residential purposes. Mr. Brophy guessed that this conversation occurred in approximately June of 1989. Mr. Brophy admitted that there is no documentation reflecting that any such conclusion was reached by Fuss O'Neill.
In mid-June of 1989, Mr. Brophy retained Attorney Steven Penny to obtain the land use approvals for the Town of Somers for a project which was designed to convert a former industrial mill building to residential use. In early January of 1990, several months after plaintiffs fired Fuss O'Neill, plaintiffs hired Lenard Engineering, Inc. ("Lenard"). Mr. Brophy testified at a deposition that Lenard was hired to "redo the work that Fuss O'Neill had done," and that Lenard was hired to do a complete site analysis, and "to review the floodway and to analyze the floodway and to give [plaintiffs] the appropriate 100-year flood level, in comparison to the building's floor elevations."
Mr. Brophy testified that Lenard's analysis showed that the first floor of the Mill building was outside or above the 100 year flood level and that after Lenard finished its initial research, which included researching the building's involvement in the floodway, Lenard "came back CT Page 2120 positive for residential conversion and a decision was made." Brophy testified that the plaintiffs chose to pursue residential development of the property after Lenard had finished researching this issue.
In the meantime, in March of 1990, the Town of Somers passed extensively revised and expanded Zoning Regulations. Attorney Steven Penny testified that the 1990 regulations did not provide for any
industrially related permitted uses in an industrial zone without a zone change. Brophy testified that the only use permitted without a site plan in the new regulations was farming or agricultural. Therefore, both before and after the regulations were amended in 1 990, the plaintiffs knew that in order to convert the Mill for residential use, they needed to apply for a zoning amendment to permit such use. Any such amendment requires Town approval.
On July 9, 1990, Attorney Penny resubmitted plaintiffs' zoning application for an amendment to the regulations for a special use permit, which the Town approved on December 3, 1990, allowing plaintiffs to apply for a special use permit for conversion of a mill building into residential uses. Sometime prior to February, 1991, the plaintiffs fired Lenard. Plaintiffs then hired another engineering firm, Doane Engineering, to work on the Somers Mill project.
Mr. Doane prepared a site plan for the development of 102 residential units in the Mill, which he certified on March 6, 1991. He submitted his site plan to the Town of Somers Planning Commission with an application for a special use permit on March 20, 1991. In the site plan, Doane represented that the based flood elevation ("BFE") at the front of the Somers Mill building on Maple Street was 180 feet. Mr. Doane testified that the elevation information in his site plan was correct at that time, because the FEMA FIRM map depicted the 100-year BFE as 180, lower than the floors to be used for residential. He believes that the first floor of the building could have been used for residential purposes, up until the revision of the base flood elevation (BFE) by FEMA in 1995.
On July 11, 1991, Darcey Collins, an engineer with Doane Engineering, spoke with Kevin Merli at FEMA's Boston office about the discrepancy between the base flood elevation (BFE) shown on the FIRM, 180, and the BFE shown on a cross-section of the flood profiles of the FIS, 188.7. She memorialized this conversation and also spoke with Mr. Doane and Attorney Penny about the issue. At his deposition Attorney Penny testified that he discussed this discrepancy with Mr. Brophy. In the documents filed in opposition to the Motion for Summary Judgment, Mr. Brophy has denied any knowledge of this discrepancy but admits he had knowledge in 1991 "that there was an issue in 1991 concerning whether Somers Mill would have to be designed to withstand a five hundred year flood." See Affidavit of CT Page 2121 Lawrence Brophy, dated October 3, 2001.
On October 7, 1991, the Town of Somers Zoning Commission denied the plaintiffs' application for a special use permit on the grounds that the plaintiffs had not met numerous conditions specified by the Town Water Pollution Control Authority, and had not responded to concerns of the Town Engineer, Mervyn Strauss. The plaintiffs appealed the decision and the parties then litigated the denial of the application and a related tax appeal regarding the proper assessment of the property. During the pendency of the litigation, the parties attempted to mediate the dispute on their own. Since the parties were unable to resolve the issues on their own, the Court eventually issued a decision in the case on March 23, 1995, remanding the plaintiffs' application back to the town for re-consideration.
On June 16, 1995, FEMA issued a formal Letter of Map Revision (LOMR) for the area which includes the Somers Mill. FEMA officially raised the original 100-year flood elevation, or BFE, from 180 feet to 189 feet. In its LOMR, FEMA recognized that in making its original determination, FEMA had incorrectly transferred data from the underlying flood study to the FIRM, and that the flood map revision was issued to correct its own earlier miscalculation. As a result of this action, the first floor was below the FIRM base flood elevation.
Nevertheless, the project was approved by the Town of Somers on October 2, 1995, subject to certain contingencies, one of which was that no residential floor of the building could be below the 100-year flood elevation. The plaintiffs now claim that they cannot carry out their proposal for renovating the Mill due to these developments, because the building needs to be flood-proofed.
Discussion of the Law and Ruling
Practice Book § 17-49 (formerly § 384) provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Connecticut Bank Trust Co. v. Carriage Lane Associates,219 Conn. 772 780-81, 595 A.2d 334 (1991); Lees v. Middlesex Ins. Co.,219 Conn. 644, 650, 594 A.2d 952 (1991). Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434,429 A.2d 908 (1980); a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact, together with the evidence disclosing the existence of such an issue. Practice Book §§ 17-45, 17-46; Burns v. Hartford Hospital, CT Page 2122192 Conn. 451, 455, 472 A.2d 1257 (1984). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. Town Bank Trust Co. v. Benson,176 Conn. 304, 309, 407 A.2d 971 (1973); Strada v. ConnecticutNewspapers, Inc., 193 Conn. 313, 317, 477 A.2d 1005 (1984). The test is whether a party would be entitled to a directed verdict on the same facts. Batick v. Seymour, 186 Conn. 632, 647, 443 A.2d 471 (1982); NewMilford Savings Bank v. Roina, 38 Conn. App. 240, 243-44, 659 A.2d 1226
(1995).
Summary judgment should only be granted if the pleadings, affidavits and other proof submitted demonstrate that there is no genuine issue as to any material fact. Scinto v. Stain, 224 Conn. 524, 530, cert. denied,114 S.Ct. 176, 126 L.Ed.2d 136 (1993); Connell v. Colwell, 214 Conn. 242,246, 571 A.2d 116 (1991). Summary judgment is "designed to eliminate the delay and expense of litigating an issue where there is no real issue to be tried." Wilson v. City of New Haven, 213 Conn. 277, 279, 567 A.2d 829
(1989).
There is no dispute that the plaintiffs' claim against Fuss O'Neill is a claim of professional malpractice that stems from negligent misrepresentation. The allegations of the complaint revolve around the conduct of Fuss O'Neill in the practice of its profession. "Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss or damage to the recipient of those services." Winsted Land Development v. DesignCollaborative Architects P.C., 1999 WL 639942, *16 (Conn.Super. 1999), quoting Davis v. Margolis, 215 Conn. 408, 415 (1990). "In a [malpractice] case against an engineer, it is incumbent upon the plaintiff to produce evidence as to what a skilled engineer of ordinary prudence engaged in the same line of business would have exercised in the same or similar circumstances." Winsted Land Development, supra, quoting Matyas v.Minck, 37 Conn. App. 321, 327 (1995).
In the absence of expert testimony regarding the specific standard of care and a breach of that standard by Fuss O'Neill, the plaintiffs cannot establish that Fuss O'Neill's alleged conduct constituted a breach of the standard of care. See, Matyas v. Minck, 37 Conn. App. 321
(1995) (affirming the trial court's finding that, absent expert testimony, plaintiffs failed to prove breach of the standard of care by the engineer).
Plaintiffs in this case disclosed an engineering expert, Edward T. T. Chiang, Ph.D, P.E. Dr. Chiang is a professional engineer specializing in CT Page 2123 hydraulics and was disclosed as the author of a hydraulic study of the Scantic River, and as a standard of care expert against. Fuss O'Neill and Lenard. Dr. Chiang testified at his deposition generally as to what he would have done if he had been asked to do a detailed flood analysis of a river. He did not, however, have any knowledge of what the plaintiffs asked Fuss O'Neill to do in connection with the Somers Mill project, and did not have any idea as to what in fact Fuss O'Neill did on the project.
Specifically, Dr. Chiang testified at his deposition that he did not know who or what Fuss O'Neill is and did not have any knowledge of what Fuss O'Neill did in connection with the Somers Mill project. Dr. Chiang did not determine the scope of services for Fuss O'Neill or Lenard Engineering on this project. He did not know whether Fuss O'Neill was asked to or did perform an analysis of the 100-year flood in connection with the project. He did not review any surveys, maps, plans or any other documents prepared or produced by Fuss O'Neill.
Dr. Chiang admitted that he did not have and cannot give any opinion concerning Fuss O'Neill or whether Fuss O'Neill breached the applicable standard of care for a professional engineering firm under the facts and circumstances of this case, particularly since he does not know what Fuss O'Neill did.
The plaintiffs do not deny that their disclosure as to Fuss O'Neill contains no opinion that Fuss O'Neill violated that applicable standard of care for engineers. Rather, the plaintiffs attempt to avoid summary judgment by arguing, in effect, that at the time of trial Mr. Chiang will opine that Fuss O'Neill did violate the applicable standard of care. The plaintiffs' argument fails for three reasons: 1) a party cannot oppose summary judgment by presenting argument as to what it expects its evidence will be at trial; 2) under Practice Book § 13-4(4) an expert witness' trial testimony will be limited to his pretrial disclosure and 3) a prior ruling in this case specifically bars the plaintiffs from introducing any expert opinion not specifically contained in their disclosure or report.
A party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact, together withthe evidence disclosing the existence of such an issue. Practice Book §§ 17-45, 17-46; Burns v. Hartford Hospital, 192 Conn. 451, 455,472 A.2d 1257 (1984). A statement by counsel in a legal memorandum that an expert will provide certain evidence at time of trial does not constitute evidence of anything.
Practice Book § 13-4(4) requires "any plaintiff expecting to call CT Page 2124 an expert witness at trial [to] disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. . . ."
 Practice Book § 220(D) [now 13-4 (4)] is intended to furnish a defendant with the details of a plaintiffs reliance on expert testimony in order to assist him with the preparation of his case. "The rules of discovery are designed to make a trial less of a game of blindman's [buff] and more of a fair contest with the basic issues and facts disclosed to the fullest extent possible." (Internal quotation marks omitted.) Sturdivant v. Yale-New Haven Hospital, 2 Conn. App. 103, 106, 476 A.2d 1074
(1984). A trial court may, in the exercise of its discretion, impose sanctions on a party for failure to comply with the rules of disclosure. These sanctions include the exclusion of expert testimony at trial. See Practice Book § 220(D); Yale University School of Medicine v. McCarthy, 26 Conn. App. 497, 500, 602 A.2d 1040 (1992).
Ciarlelli v. Romeo, 46 Conn. App. 277, 280, 699 A.2d 217 (1997).
In Ciarlelli the trial court precluded the expert witness from testifying on matters which exceeded the scope of the § 220(D) disclosure. Since Dr. Chiang expressed no opinions as to the professional conduct of Fuss O'Neill either in his disclosure or at his deposition, he will not be able to testify as to such conduct at trial.
Dr. Chiang's disclosure states that a "competent engineer would have quickly discovered a discrepancy in the Base Flood Level to be elevation 180 while the Flood Insurance Study and Floodway Map show the Base Flood Level at the same location to be elevation 188.7." However, this states no opinion as to whether Fuss O'Neill violated the standard of care for engineers. In order to give such an opinion, Dr. Chiang would need to know what Fuss O'Neill was hired to do, whether it had the opportunity to complete that which it was hired to do, whether any representations it made were in writing, were certified, or were merely oral
The plaintiffs do not dispute that Dr. Chiang lacked all of the foregoing information and gave no specific opinion as to Fuss O'Neill. However, the plaintiffs apparently believe that notwithstanding their failure to comply with 13-4 (4), Code of Evidence § 704 will allow CT Page 2125 then to ask Dr. Chiang hypothetical questions at trial based on the facts of the case. This argument does not address the disclosure issue. Clearly where an expert states only a general opinion about a standard of care in his 13-4 (4) disclosure, has no opinion as to the conduct of a defendant at his deposition, he will not be permitted to offer such an opinion for the first time at trial. This would subject a defendant like Fuss 
O'Neill to precisely the type of "blind man's bluff," that the rules on expert disclosure are meant to prevent.
Not only will Dr. Chiang's trial testimony be barred because it will be outside the scope of his disclosure, see, e.g., Kemp v. EllingtonPurchasing Corp., 9 Conn. App. 400 (1986) (excluding plaintiffs engineering expert's testimony on constructive notice at trial, since expert testified at his deposition that he had not been asked to determine that particular issue), it will also be barred based on an existing Order in this case.
On February 2, 2001 in a Ruling on Motion for Order of Compliance and Motion to Preclude Experts this court ruled that the plaintiffs would be precluded at trial from eliciting any previously undisclosed opinions from their experts. In that ruling the court further ordered the plaintiffs to provide the defendants with written reports of all their experts, or with detailed statements of the specific opinions and the specific bases for those opinions, signed by the plaintiffs' experts, by March 15, 2001. The Ruling also ordered that "an opinion not in the report will not be admitted at trial" and "an opinion not in the statement will not be admitted at the trial."
As set forth above Dr. Chiang's written statement dated March 2, 2001 does not include any opinion as to the specific standard of care for a Connecticut engineering firm performing preliminary site planning work in 1989, nor does the statement contain any opinion about Fuss O'Neill, or that Fuss O'Neill violated the specific standard of care in connection with its work.
The court hereby grants the Motion for Summary judgment in favor of Fuss O'Neill because the plaintiffs have failed to provide any competent expert evidence in this professional malpractice case that Fuss O'Neill violated the applicable standard of care.
Fuss O'Neill has raised a number of other grounds for summary judgment. While many of those grounds appear valid, they are not bases for this ruling. The plaintiffs have presented enough evidence to raise issues of fact with respect to certain grounds. The state of the law relevant to other grounds is sufficiently uncertain to preclude summary judgment. CT Page 2126
The alternate factual ground argued by Fuss O'Neill which has the most merit is the plaintiffs' lack of evidence of a causal connection between any alleged misrepresentation by Fuss O'Neill and the plaintiffs' damages. Fuss O'Neill argues that the plaintiffs could not have relied on their alleged verbal representation as to flood levels because Mr. Brophy has admitted that in 1989 the plaintiffs hired Lenard Engineering to redo that which Fuss O'Neill did/was supposed to have done and that the plaintiffs decided to pursue a plan for residential development of the Mill property only after receiving the report of Lenard which indicated that the first floor of the Mill was above the 100 year flood level. As of 1989, then, Fuss O'Neill argues, the plaintiffs no longer reasonably relied on any work or representation by Fuss 
O'Neill. In opposition, the plaintiffs argue that they were damaged by not knowing about a discrepancy in the flood elevations levels in 1989. While it is unclear how this knowledge damaged the plaintiffs or when in fact they did know about the discrepancy, the facts are sufficiently murky that they do not lend themselves to summary judgment on this issue.
Fuss O'Neill has also argued that it is entitled to summary judgment because the two year statute of limitations of Connecticut General Statutes § 52-584 applies here rather than the seven year statute found in § 52-584a. Section 52-584a provides in pertinent part
 No action or arbitration, whether in contract, in tort, or otherwise, (1) to recover damages (A) for any deficiency in the design, planning, contract administration, supervision, observation of construction or construction of an improvement to real property . . . shall be brought . . . more than seven years after substantial completion of such improvement.
Emphasis added.
In Grigerik v. Sharpe, 247 Conn. 293, 721 A.2d 526 (1998) the Supreme Court held that even though no improvement had been done to the plaintiffs property by the defendant engineer, the seven year statute of limitations contained in § 52-584a applied to the alleged malpractice of the engineer because such malpractice had prevented the improvement in question from being made.
The Court in Grigerik stated:
In the ordinary case, therefore, the seven year CT Page 2127 statute of limitations begins to run from the date of the substantial completion of the improvement for which the architect or engineer performed the services. In this case, therefore, had the proposed septic system that was the subject of the defendants' services been installed, the seven years would have begun to run from the date when the system was first used or available for use. The case before us, however, presents the question of whether § 52-584a
applies to a situation in which the defect in the professional services rendered was discovered before the intended improvement was begun, and the reason that the improvement was not and could not be effectuated was precisely because of that defect.
247 Conn at 307. Emphasis added.
In this case there was no completion of any improvement. Unlike the engineer in Grigerik, Fuss O'Neill did not complete anything in writing. Nevertheless, the question of whether an improvement, in this case renovation of the Mill, was not completed due to defective professional services by Fuss O'Neill is clearly factbound and should be resolved after trial.
To reiterate, summary judgment may issue in favor of Fuss O'Neill because the plaintiffs have failed to produce any evidence by way of expert testimony that Fuss O'Neill violated any professional standard of care.
By the court,
 ___________________ Aurigemma, J.